ALSIP PARK DISTRICT, Plaintiff-Appellant, v. D & M PARTNERSHIP *et al.*, Defendants-Appellees.

First District (3rd Division)   No. 1—91—3206

Opinion filed June 16, 1993.

Vincent Cainkar, of Burbank, for appellant.

Richard E. Friedman and Gerald B. Mullin, both of Chicago, for appellees.

JUSTICE RIZZI delivered the opinion of the court:

Plaintiff, Alsip Park District (District), brought this condemnation action against defendants, D & M Partnership (D&M) and unknown owners, to acquire land (the site) for which a building permit was previously issued to construct a group home for developmentally disabled persons. The trial court granted defendants a traverse and dismissed the action on their motion, on the basis of its finding that plaintiff abused its discretion when exercising the power of eminent domain because plaintiff had no purpose, ascertainable public need or plan, current or future, for the site. We reverse and remand.

The issues before this court for review are (1) whether the trial court's finding that plaintiff had no purpose, ascertainable public need or plan, current or future, for the site was contrary to the manifest weight of the evidence; and (2) whether the trial court's finding that plaintiff's taking of the site constituted an abuse of the power of eminent domain was against the manifest weight of the evidence.

The site is located at the southeast corner of 119th Place and Kostner Avenue within the District's corporate limits. Located across Kostner Avenue, west of the site, is a swimming pool and recreational facility known as Aquatic Park. To the north of the site, across 119th

Place, is a church parking lot. Prairie Junior High School is located northwest of the site. The parking lot for the school adjoins a parking lot for Aquatic Park. To the east is a residential development and to the south is additional land owned by the District.

On January 11, 1989, defendant D&M entered into a contract to purchase the site whereupon RFMS, Inc. (RFMS), planned to construct a group home. Defendant D&M is an Illinois general partnership organized for the purpose of acquiring sites for the construction of group homes for developmentally disabled persons on behalf of RFMS, a Nevada corporation registered to transact business in the State of Illinois, which constructed and managed homes for developmentally disabled persons.

After defendant D&M purchased the site, RFMS obtained a special use permit for the group home from the Village of Alsip. Soon after RFMS applied for the permit, several citizens approached James T. Quinn, a member of the District's Board of Park Commissioners (Board/Board Commissioners), and told him that they were opposed to defendants' proposed use of the site.

On or about May 30, 1989, plaintiff informed RFMS that it desired to acquire the site. RFMS thereafter communicated with plaintiff, suggesting alternatives for the parties' shared use of the site, so as to permit the use of a portion of the site by it for the group home and a portion of the site by plaintiff for parkland. On or about June 20, 1989, RFMS offered to convey between 40 and 50 feet of the site to plaintiff. On or about June 28, 1989, plaintiff rejected that proposal.

On July 25, 1989, the District passed ordinance No. 89—4 (ordinance) authorizing the acquisition of the site by defendants. Plaintiff later introduced a certified copy of the ordinance into evidence. On September 21, 1989, RFMS received a certificate of need from the Illinois Health Facilities Planning Board to construct and operate a 15-bed facility for the developmentally disabled.

On October 26, 1989, plaintiff informed RFMS that it would obtain the site via an exercise of its eminent domain power and it then initiated condemnation proceedings. On November 3, 1989, plaintiff filed this complaint.

On December 1, 1989, RFMS and defendant D&M brought an action in the United States District Court for the Northern District of Illinois seeking a preliminary and a permanent injunction to restrain the condemnation proceeding and for other relief under the Fair Housing Act (42 U.S.C. §3601 *et seq.* (1989)). (See *R F M S, Inc. & D & M Partnership v. Alsip Park District*, No. 89—C—8900.) On

June 29, 1990, the district court entered an order staying the Federal court proceedings pending this court's determination of the issues in the present case and dismissing the portion of the complaint which sought to enjoin condemnation of the site.

Defendants presented the testimony of James T. Quinn, Leslie S. Pollock and John Curran to the circuit court, concerning the necessity and excessiveness of the taking during a hearing on defendants' traverse and motion to dismiss. James T. Quinn testified that he had been a Board Commissioner for eight years and that he spent 20 to 25 hours per week working on matters pertaining to plaintiff. Quinn further testified that plaintiff had no concrete plans for the use of the site. Quinn told the court that plaintiff acquired the site for "inventory purposes" rather than immediate use and that all of the Commissioners knew that if the property was condemned, "there wouldn't be a group home built on it."

Next, Leslie S. Pollock, a city planner, and an expert witness, testified that he conducted an investigation of plaintiff's parks and park services in order to obtain information about the pattern of land use in the vicinity of the site and the ultimate population growth of the District.

Pollock stated that there are general guidelines used in park planning which prescribe the appropriate number of acres of parkland per 1,000 persons in the population. Pollock testified that one such commonly employed standard is the Recreation, Park and Open Space Standards and Guidelines written by the National Recreation and Park Association (NRPA). The Recreation, Park and Open Space Standards and Guidelines provide for a minimum of 6.25 to 10.5 acres of parkland per 1,000 persons.

Pollock further testified that the Village of Alsip was divided into eight neighborhoods based upon land usage and physical boundaries. Pollock testified that he prepared an analysis of the balance, quality and distribution of recreational and park services in each of the eight neighborhoods. Pollock testified that in the course of his analysis, he examined the ratio of parkland to the population in order to determine whether there was a "surplus" or "deficit" of parkland, where such a deficit or surplus might be located and how the acquisition of the site would affect said surplus or deficit.

Pollock testified that the ratio of neighborhood and mini-parks per 1,000 persons in the District is 2.99 acres per 1,000 persons. At the time plaintiff brought this action, neighborhood B, where the site is located, had 132.95 acres of recreational and open space including schools and parking lots and a population of 4,926 persons. Pollock

found that neighborhood B had the largest ratio of acres of parkland per 1,000 persons (13.65 acres per 1,000 persons) in the District and that the ratio of neighborhood and mini-parks per 1,000 persons within neighborhood B is 5.65 acres per 1,000 persons. Pollock also told the court that neighborhood B had more than twice the ratio of parkland per 1,000 persons as the next highest neighborhood ratio within the Village of Alsip.

Pollock concluded that there was no need for plaintiff to acquire the site for the following reasons: (1) because there was already a surplus of park and recreational land in the area that would be served by the site; (2) because there is no public demand for use of the site; (3) because the acquisition of the site would not be useful to the public; and (4) because the site would not be needed as "inventory" for future recreational purposes.

Upon cross-examination, however, Pollock admitted that 2.99 acres per 1,000 persons was not the actual average ratio of the District, but was an average of the average ratios for each neighborhood. Pollock also conceded that the 13.65-acres-per-1,000-persons ratio within neighborhood B included all school property even if such property was not designated for recreational use. Furthermore, Pollock admitted that he failed to consider the use of plaintiff's parks by nonresidents and that he neglected to interview program participants and area citizens in the course of his investigation.

Next, defendants called John Curran, director of the District, as an adverse witness. Curran stated that he had served as the director since 1979. Curran testified that plaintiff serves a large nonresident population, including members of the Southwest Suburban Special Recreational Association and an industrial baseball league involving 1,200 persons, 80% to 85% of whom were not residents of the District. Curran testified that at the time the ordinance was passed, plaintiff planned to expand its parklands to accommodate anticipated future recreational needs including space for soccer, tennis courts and parking facilities. Curran stated, however, that there is no written development plan for the site. Curran maintained that in formulating its plan, the Board surveyed the community and had meetings with area citizens to help it determine the proper course of programming and facility development.

Curran further testified that plaintiff currently owns or leases 168 acres, at least 95% of which remains undeveloped. Curran stated that plaintiff planned to use most of the undeveloped land for a golf course near Kedzie Avenue. Curran also told the court that plaintiff planned to construct a pedestrian path from 127th Street to Aquatic Park.

Upon cross-examination, Curran testified that plaintiff is developing plans for the site and working on a new five-year master plan, although the entire five-year plan would not be fully executed within a five-year period.

After defendants rested, plaintiff called Robert A. Porter and Charles Galvin as witnesses. Porter testified as an expert witness. Porter was the director of parks and recreation for the Lemont Park District, the township supervisor of Lemont Township and the owner of a consulting company. Porter analyzed each park in the District in an effort to determine which resources were located thereon and what area it serviced. Porter determined that the parkland ratios for plaintiff amounted to 3.79 acres of owned park property for every 1,000 persons, excluding the Kedzie golf course. Porter found that there were 5.32 acres of parkland per 1,000 persons if leased parklands were included.

In preparing his analysis, Porter also met with plaintiff's administrators, surveyed its parks and reviewed its recreational programs as well as the site. Porter noted that there were several unusual aspects of plaintiff's programming, such as its allowing a large number of non-District residents to utilize parklands and park facilities. Porter testified that this use factor was not found in other park districts and that said use affected the amount of parkland needed to adequately serve the area. Porter concluded that plaintiff does not have adequate parkland.

Porter also concluded that the proper amount of parkland with respect to the District's population would be 10 acres per 1,000 persons. This standard includes allowances for mini-parks, neighborhood parks, community parks and undeveloped land, but excludes special facilities such as a golf course and land planned for special facilities. Porter also maintained that church grounds and property occupied by Commonwealth Edison should not be counted in meeting parkland standards because such land is not available for public recreational use.

Porter testified that acquisition of the site would be consistent with plaintiff's five-year plan and was desirable even if plaintiff did not have a plan. Porter further testified that the acquisition of the site would be desirable because it was located in the center of the District and was easily accessible to the public via two main thoroughfares. Porter also stated that the site was desirable because it would serve the three largest neighborhoods in the District containing a total population of 12,700 persons. Porter further maintained that the site was desirable because it had infrastructure in place and because it tied into the idea of developing a community park in conjunction with

Aquatic Park and the proposed path across the property occupied by Commonwealth Edison.

Porter further testified that the acquisition of the site would be favorable because plaintiff may need additional parking space for Aquatic Park. Porter opined that the parking ratio for Aquatic Park should be one space per seven patrons, requiring 187 parking spaces, whereas the District only had 45 parking spaces on the property it owns.

On cross-examination, Porter testified that the primary document he relied upon in forming his opinions was plaintiff's exhibit 35, the NRPA Recreation, Park and Open Space Standards and Guidelines. Porter conceded that he did not know whether any demographic studies, preference and demand studies or base of participation data were created with regard to the site. Porter also admitted that he made his analysis based upon the assumption that the site would be developed into a community park.

Next, Charles Galvin testified for plaintiff. Galvin told the court that he had been a Board Commissioner for eight years and that he worked between 60 and 80 hours per month on plaintiff's business. Galvin testified that participation in plaintiff's programs had doubled in the last eight years. Galvin stated that he was familiar with the site, as the Commissioners had discussed acquiring the site as a community park. Galvin testified that the possible uses discussed for the site included volleyball facilities, a soccer field and a park, but that no exact determination concerning the development of the site had been made. Galvin maintained that it is the standard procedure of the District to acquire land and then formulate a preliminary plan for its development. Thereafter, the District would present its preliminary plan to area residents, seeking and receiving the citizens' input concerning specific land use and the type of infrastructure that should be placed on the land.

Defendants then presented a traverse and a motion to dismiss based upon necessity and a violation of the Federal Fair Housing Act (42 U.S.C. §3601 et seq. (1989)). After a hearing on motions, the trial court decided in favor of the District on the Fair Housing Act claim. The trial court concluded that the taking of the site was an abuse of discretion as plaintiff had no purpose, ascertainable public need or plan, current or future, for the site. The trial court granted defendants' traverse and then dismissed the action. Plaintiff appeals from that order. No cross-appeal was taken by defendants pertaining to the trial court's decision regarding the Fair Housing Act claim. Arguments which pertain to the issue of necessity are set forth herein.

■ First, plaintiff contends that the trial court's finding that it had no ascertainable public need or plan, current or future, for the land was contrary to the manifest weight of the evidence. Plaintiff argues that this finding was improper because the necessity for the taking of the site was a legislative determination to be made by the Board, as it has wide discretion to determine the amount of property necessary to condemn for a legitimate public purpose and because it may acquire property for anticipated needs. Defendants maintain that the trial court's finding was proper because there was a surplus of land in the vicinity of the site which exceeded the standards for accessible parkland.

Initially, we strongly agree with the premise that if the facts established that plaintiff had no ascertainable public need or plan, current or future, for the land, defendants should prevail. We find, however, that the trial court's finding was against the manifest weight of the evidence because defendants failed to successfully rebut plaintiff's *prima facie* case for the necessity of condemning the site. Illinois courts have refused to second-guess a condemnor's authority with respect to its decision concerning the necessity of a taking or its decision regarding the amount of property it deems necessary to condemn for a public purpose. (*Department of Public Works & Buildings v. Keller* (1975), 61 Ill. 2d 320, 325, 335 N.E.2d 443, 447; *City of Chicago v. Vaccarro* (1951), 408 Ill. 587, 597, 97 N.E.2d 766, 772.) In Illinois, the issue of whether the exercise of the power of eminent domain is necessary and sufficient to justify the taking of private property for a public purpose is not a judicial question, but instead constitutes a legislative determination that is within a condemnor's discretion. (*Keller*, 61 Ill. 2d at 325, 335 N.E.2d at 447; *Department of Public Works & Buildings v. Lewis* (1952), 411 Ill. 242, 245-46, 103 N.E.2d 595, 597-98; *City of Chicago v. Lehmann* (1914), 262 Ill. 468, 470-71, 104 N.E. 829, 830.) The introduction of a valid ordinance approving the taking of private property for a public purpose into a trial record establishes a *prima facie* case with respect to the necessity of the condemnor's acquisition of the property, making it the duty of the party challenging said condemnation to offer evidence that the condemnor abused its discretion with respect to its decision concerning the necessity of the taking. *Trustees of Schools of Township No. 37 v. First National Bank* (1971), 49 Ill. 2d 408, 414, 274 N.E.2d 56, 60; *Village of Wheeling v. Exchange National Bank* (1991), 213 Ill. App. 3d 325, 331, 572 N.E.2d 966, 969; *City of Oakbrook Terrace v. La Salle National Bank* (1989), 186 Ill. App. 3d 343, 350, 542 N.E.2d

478, 482; *City of De Kalb v. Anderson* (1976), 43 Ill. App. 3d 915, 917, 357 N.E.2d 837, 839.

Defendants have failed to establish that plaintiff abused its discretion with respect to its decision to acquire the site. Plaintiff had wide discretion to determine the amount of land to be taken. The Board passed an ordinance which constituted a legislative determination with respect to the necessity for condemning the site. Plaintiff introduced a certified copy of the ordinance at the hearing on the traverse and motion to dismiss. The introduction of the ordinance into evidence was sufficient to establish a *prima facie* case for the necessity of the condemnation of the site and plaintiff's authority to exercise its power of eminent domain.

The burden then shifted to defendants to show that plaintiff abused its discretion or lacked the authority to condemn the site on the basis that plaintiff had no purpose, ascertainable public need or plan, current or future, for the site. Defendants failed to meet their burden of proof. After plaintiff established a *prima facie* case for the necessity of the taking, defendants presented the testimony of Pollock, an expert witness, and District director Curran, an adverse witness. Plaintiff then introduced the testimony of Porter, an expert witness, and Commissioner Galvin. Galvin, who served on the Board for eight years and spent many hours each month working on matters pertaining to plaintiff, testified that participation in plaintiff's park programs had doubled in the last eight years. Galvin had firsthand knowledge of the facilities and programs needed to service the District. Galvin stated that he was familiar with the site, as the Commissioners had discussed acquiring the site as a community park.

Curran, who had served as District director for 10 years, testified that a large nonresident population, including members of the Southwest Suburban Special Recreational Association and an industrial baseball league with 1,200 residents, 80% to 85% of whom were not District residents, used plaintiff's parkland. Curran, like Galvin, had firsthand knowledge of the infrastructure and programs needed to properly serve the District. Curran testified that at the time the ordinance was passed, plaintiff planned to expand its parklands to accommodate future recreational needs including soccer, tennis and parking facilities.

In addition, Porter testified that plaintiff does not have adequate parkland due to its accommodation of a large number of non-District residents with respect to their use of parklands and park facilities. Porter concluded that the acquisition of the site by plaintiff would be desirable.

Curran's and Galvin's immediate knowledge with respect to plaintiff's needs exceeded that of Pollock, defendants' expert witness, who opined that the site should not have been acquired. Furthermore, Porter's analysis of plaintiff's needs was more comprehensive than Pollock's analysis since Porter considered the use of plaintiff's parkland by non-District residents as a factor in his analysis, while Pollock failed to consider the use of plaintiff's parks by nonresidents as a factor in his determination concerning the issue of the propriety of plaintiff's taking of the site. Pollock's analysis was also inferior to Porter's study because Pollock assumed that the site would be developed as a neighborhood park, whereas the record shows that plaintiff intended to develop the site into a community park. In contrast, Porter based his analysis upon the notion that the site would be used as a community park. For the above reasons, we conclude that defendants have failed to successfully rebut plaintiff's *prima facie* case for the necessity of condemning the site.

■ We also rule that the trial court's finding that plaintiff had no purpose, ascertainable public need or plan, current or future, for the site was against the manifest weight of the evidence because plaintiff properly acquired the site for its anticipated needs by exercising its power of eminent domain. Our supreme court has held that a condemning authority should "anticipate the future increased demands for the public use to which the land is to be devoted." (*City of Chicago v. Vaccarro* (1951), 408 Ill. 587, 597, 97 N.E.2d 766, 772.) The advance acquisition of parkland is practical in a society with a growing population and changing recreational needs.

We are not persuaded by defendants' argument that the taking of the site was unnecessary on the basis that plaintiff already owns undeveloped land south of the site and that the amount of said land combined with land already owned by plaintiff exceeded the standards for accessible parkland. The record shows that the amount of land plaintiff owned before it sought to acquire the site did not exceed the standards for accessible parkland. The minimum standards for parklands established by the NRPA in its Recreation, Park and Open Space Standards and Guidelines provide that there should be a minimum of 6.25 to 10.5 acres of District parkland per 1,000 persons. Pollock testified that his ideal minimum standard of parkland in the District would be in the range of 5 to 10 acres per 1,000 persons. Porter testified that his ideal minimum ratio for District parkland would be 10 acres per 1,000 persons.

Both experts testified that the ratio of parkland per 1,000 persons in the District was lower than that of any of the above recommended

ratios. Pollock testified that the ratio of neighborhood and mini-parks per 1,000 persons in the District is 2.99 acres per 1,000 persons. Porter testified that the parkland ratios for the District amounted to 3.79 acres of owned park property for every 1,000 persons excluding the Kedzie golf course. Porter found that there were 5.32 acres of parkland per 1,000 persons if leased parklands were included.

Defendants' assertion that the trial court's finding was not contrary to the manifest weight of the evidence because there was a surplus of land in the vicinity of the site which exceeded the standards for accessible parkland is therefore erroneous on the basis of the facts in the record.

Moreover, defendants' argument must fail on the basis that it is contrary to Illinois law. The Illinois Supreme Court has defined necessity with respect to the exercise of the power of eminent domain as meaning " 'expedient,' 'reasonably convenient' or 'useful to the public,' and [not] limited to an absolute physical necessity." (*Department of Public Works & Buildings v. Lewis* (1952), 411 Ill. 242, 245, 103 N.E.2d 595, 597.) The standard used by Illinois courts in determining whether an entity has abused its condemnation power by taking more property than necessary is whether the proposed taking was "grossly excessive." *City of Waukegan v. Stanczak* (1955), 6 Ill. 2d 594, 604, 129 N.E.2d 751, 756.

In order for defendants to establish that plaintiff's condemnation of the site was "grossly excessive," they would have to demonstrate that the taking was neither expedient, nor reasonably convenient, nor useful to the public. Defendants have failed to make such a showing. The acquisition of the site was expedient in regards to the development of a community park. The site is located in the middle of the District and is adjacent to Aquatic Park and the undeveloped land south of the site. The site is a key parcel of property which ties both Aquatic Park and the undeveloped properties together. It would therefore be reasonably convenient for plaintiff to obtain the site in order to expand and develop its parkland. Furthermore, the site will be useful to the public. It is clear that the site could be used by plaintiff as a public recreational area.

We therefore conclude that the trial court's finding that plaintiff had no ascertainable public need or plan, current or future, for the site was contrary to the manifest weight of the evidence, as defendants have failed to offer evidence sufficient to defeat plaintiff's *prima facie* case for the necessity of condemning the site and because it was proper for plaintiff to acquire the site to meet its anticipated future needs.

█ The second issue before this court is whether the trial court's finding that plaintiff's taking of the site amounted to an abuse of the power of eminent domain was against the manifest weight of the evidence. Plaintiff alleges that the trial court's finding that the taking was an abuse of its power of eminent domain was contrary to the manifest weight of the evidence. Plaintiff argues that the trial court's finding was improper because Illinois law does not require final use plans for property acquired by condemnation prior to an entity's exercise of the power of eminent domain and because the testimony of certain witnesses established that plaintiff does not own property sufficient to meet minimum requisite standards for parklands, including that of the NRPA. Defendants maintain that the finding of the trial court that the taking was an abuse of the power of eminent domain was not contrary to the manifest weight of the evidence. We disagree.

An eminent domain action may be maintained even though the ultimate use of the subject property has not been determined as long as the ordinance authorizing the condemnation states that the acquired property will be taken for a public purpose. (*City of Oakbrook Terrace v. La Salle National Bank* (1989), 186 Ill. App. 3d 343, 350, 542 N.E.2d 478, 482; *State of Illinois Medical Comm'n v. United Church of the Medical Center* (1986), 142 Ill. App. 3d 498, 503, 491 N.E.2d 1327, 1331; *Department of Transportation v. Keller* (1984), 127 Ill. App. 3d 976, 978-79, 469 N.E.2d 262, 265.) In the present case, the proposed use for the site is a community park and public recreational area, although there are no specific plans as to the exact facilities and infrastructure that will be constructed thereon. Defendants' assertion that plaintiff is required to have a plan for developing specific facilities on the site prior to its acquisition is contrary to Illinois law.

In addition, we rule that the trial court's finding was improper because the testimony of certain witnesses established that the District does not meet minimum standards for parklands, including those of the NRPA. As we noted above, Pollock and Porter testified that the amount of parkland owned by plaintiff is not sufficient to meet the minimum standards for parklands established by the NRPA in its Recreation, Park and Open Space Standards and Guidelines or the minimum standards for parkland that they themselves recommended.

We therefore conclude that the trial court's finding that the taking of the site was an abuse of the power of eminent domain was contrary to the manifest weight of the evidence on the basis that plaintiff does not comply with the minimum standards for the amount of parkland and because plaintiff is not required to have a specific development plan for the site prior to its acquisition.

For the above reasons, we reverse the order of the circuit court and remand this cause for further proceedings consistent with this opinion.

Reversed and remanded.

TULLY, P.J., and GREIMAN, J., concur.