289 N.J. Super. 329 (1995)
673 A.2d 856
BOROUGH OF ESSEX FELLS, A BODY POLITIC OF THE STATE OF NEW JERSEY, PLAINTIFF,
v.
THE KESSLER INSTITUTE FOR REHABILITATION, INC., A NON-PROFIT CORPORATION OF THE STATE OF NEW JERSEY; STATE OF NEW JERSEY; DONALD MUELLER; NEW YORK AND NEW JERSEY TELEPHONE CO. ESSEX FELLS ELECTRIC AND WATER CO.; JOHN DOE, DEFENDANTS.
Superior Court of New Jersey, Law Division Essex County.
Decided August 4, 1995.
*331 Dennis J. Drasco, for plaintiff (Lum, Hoens, Conant, Danzis & Kleinberg, attorneys).
Donald F. Nicolai, for defendants (Lindabury, McCormick & Estabrook, attorneys).
JULIO M. FUENTES, J.S.C.
This condemnation action was commenced by plaintiff, the Borough of Essex Fells (borough), to acquire for a public park a 12.5 acre parcel of land currently owned by defendant, the Kessler Institute for Rehabilitation, Inc. (Kessler). Kessler has challenged the borough's authority to take the property on grounds that the stated public use is a pretext to exclude Kessler from the community. I conclude that the Borough of Essex Fells filed this *332 condemnation proceeding in order to prevent Kessler from establishing a rehabilitation facility in the community. The Borough has thus acted in bad faith in exercising its power to condemn property and the complaint is therefore dismissed.
The facts are not largely disputed and are summarized from the submissions and arguments of counsel. The borough is a small, residential community in Essex County consisting of approximately 832 acres of which about 166 acres (20%) are devoted to municipal use, park land and open space. Most of the residences are single family dwellings situated on large, heavily wooded lots. Kessler is a not for profit, rehabilitation facility which provides treatment and services to persons with physical disabilities. Kessler has facilities in West Orange, East Orange and Saddle Brook.
Sometime in 1986 Kessler proposed expanding its services to include a Skilled Nursing Facility and a Transitional Living Facility. The Skilled Nursing Facility would accommodate sixty persons for the treatment of injuries or illnesses that require a less rigorous treatment program than is provided at most hospitals. The Transitional Living Facility would be a twenty unit residential facility to provide training in independent living skills necessary for community re-entry.
The Essex Fells site was identified by Kessler as an ideal location for these facilities. The tract is occupied by several buildings, and is currently zoned for educational use. It is located adjacent to the largest parcel of municipal land, a 68 acre site of heavily wooded land which contains the borough's wells and the water recharge area. Before Kessler purchased the property, it was owned and occupied for over 40 years by the Northeast Bible College ("Bible College"). In 1990, the Bible College ceased operations and offered the property for sale.
After the school closed, the borough expressed an interest in purchasing 2.53 acres of the property for use as a soccer field. The borough purchased this portion of the tract in 1991. As to the balance of the property, Borough officials were actively soliciting *333 residential developers to acquire it for development of single family residences.
In December 1990, Dr. Harvey Moskowitz, the borough planner, prepared a report which determined that continued use of the property for educational purposes was appropriate, but that if that use proved unfeasible, the tract could be rezoned for residential use. The report did not recommend acquisition of the property by the borough.
In the fall of 1991, Kessler learned about the Bible College land and buildings, and expressed an interest in purchasing the property. Soon thereafter, Bible College officials introduced Kessler representatives to the mayor and other borough officials. At this introductory meeting, the mayor informed Kessler that it had a difficult road ahead because "the town had never wanted anything but single family housing" at this site. In the spring of 1992, Kessler contracted to purchase the property.
Since the property was zoned for educational use, Kessler applied to the borough's Planning Board for a conditional use amendment to permit development of the proposed facility. Kessler was confident that it had satisfied the criteria for a variance based on its belief that the use it proposed for the property was inherently beneficial and particularly well suited to this site. Additionally, the New Jersey Department of Health had issued a Certificate of Need to Kessler for its twenty bed Transitional Living Facility for disabled persons and its sixty bed Skilled Nursing Facility to be established at this property.
In July and August 1992, Kessler made informal presentations on its initial plans at open meetings of the Essex Fells Planning Board. At these public meetings, it became apparent that there was resistance to the Kessler plan within the community. Citizens expressed concerns about the commercial nature of the Kessler proposal and the potential for increased traffic. In response to these concerns, Kessler modified its plans to reduce the scope of its programs and property development. On October 23, *334 1992, the sale contract between Kessler and the Bible College became final.
Thereafter, the Mayor and Borough Council retained the services of a planner and a land use attorney for the purpose of evaluating the suitability of this site for Kessler's proposal. Both experts deemed Kessler's development plans to be an appropriate use of the property which was consistent with the borough's Master Plan and zoning ordinances. Accordingly, the Mayor and Borough Council directed the experts to draft a conditional use amendment to the land use ordinance which would permit Kessler's proposed development of the property. By August 1993, a final draft of the land use ordinance was completed and slated to be introduced at a public hearing on October 5, 1993.
When it became public knowledge that borough officials were working on the conditional use amendment, opposition to Kessler's development plans intensified. A local organization known as the Essex Fells Preservation Committee (EFPC) was formed for the specific purpose of opposing the proposed development. In response to this heightened opposition, the Borough Council mailed an open letter to residents dated August 20, 1993, which informed citizens that "it might be best for the community to permit a use similar to Kessler's proposal on a conditional basis."
Following this letter, the EFPC conducted several rallies to express opposition to the grant of a conditional use to Kessler. Just prior to its first rally, the EFPC distributed a flier announcing:
It's time to fight Kessler, Mayor Don McWilliams and his Borough Council. Kessler's proposed plan for the former Bible College site will destroy the very fabric of our town ... The effects of a 24 hour, 7 day per week, 3 shifts per day nontaxpaying facility with psychiatric and drug abusive patients within our town will be disastrous.
Kessler contends that at this first rally it was heckled by a number of Essex Fells residents, who made several discriminatory comments against disabled persons and those who serve them. The comments included accusations that Kessler "could force the Borough to put in sidewalks to accommodate people in wheel-chairs" *335 and Kessler "would bring dirty needles and AIDS patients" into the town, and "Kessler would probably start a large drug or alcohol rehabilitation facility"
At the Borough Council meeting on September 21, 1993, a large number of residents, including members of the EFPC turned out to further express opposition to Kessler. The EFPC also urged the Borough Council to take an informal poll which would demonstrate Borough opposition to Kessler. Although many residents in the town deplored the tactics and literature of the EFPC, the group was nonetheless very vocal and persistent.
Instead of introducing the ordinance at the October 5, 1993 meeting as planned, the Mayor and Council decided to send a questionnaire to each residence. The questionnaire, mailed on or about October 19, 1993, asked residents whether they would be willing to pay the extra taxes needed to purchase Kessler's property "as additional park land." Of the questionnaires returned, 305 were in favor of acquisition while 115 opposed.
Based on these results, on November 16, 1993, the Borough Council passed Resolution 93-102 authorizing the Borough to negotiate with Kessler for the purchase of the property. The resolution stated that it was in the public interest to acquire Kessler's land for public use as park land and recreational use. The Council also passed a resolution authorizing a real estate appraisal. On March 15, 1994, the Borough Council passed a resolution approving the appraised value of $2.3 million for the property. The following day, a written offer to purchase the property for that sum was sent to Kessler. Kessler rejected the offer, and since the proposed conditional use amendment had not been introduced at the October meeting, Kessler filed for a use variance with the Essex Fells Board of Adjustment.
Thereafter, on May 17, 1994, the Borough enacted an ordinance authorizing condemnation of the property in accordance with New Jersey's Eminent Domain Law. The ordinance contains the following statement regarding the purposes of the taking:

*336 ... this property is needed for public use; specifically park land and recreational use as set forth in Resolution 93-102 of the Borough of Essex Fells, authorizing the negotiations to purchase said property for said public purposes as well as for the protection of a critical environmental area and to serve as a water recharge for wells in the area. (Ordinance No. 94-627).
On June 6, 1994, the borough filed a complaint in condemnation. Pursuant to N.J.S.A. 20:3-11, the complaint has been stayed pending resolution of Kessler's bad faith challenge to the borough's taking. In May 1995, the Essex Fells Board of Adjustment denied Kessler's bid for a use variance.
Generally, a government entity may take, or condemn, private property where it is essential for public use, and where just compensation has been made to the owner. U.S. Const., Am. XIV; N.J. Const., art. I, ¶ 20 ("Private property shall not be taken for public use without just compensation.") See also State v. Silver, 92 N.J. 507, 457 A.2d 463 (1983); State v. South Hackensack Tp., 65 N.J. 377, 322 A.2d 818 (1974); State v. Gallant, 42 N.J. 583, 202 A.2d 401 (1964); Spiegle v. Borough of Beach Haven, 46 N.J. 479, 218 A.2d 129 (1966), cert. denied, 385 U.S. 831, 87 S.Ct. 63, 17 L.Ed.2d 64 (1966); Morris Cty. Land Imp. Co. v. Parsippany-Troy Hills Tp., 40 N.J. 539, 193 A.2d 232 (1963); State v. Burnett, 24 N.J. 280, 131 A.2d 765 (1957); Abbott v. Beth Israel Cemetery Ass'n of Woodbridge, 13 N.J. 528, 545, 100 A.2d 532 (1953); Kessler v. Tarrats, 194 N.J. Super. 136, 476 A.2d 326 (App.Div. 1984).
The exercise of the State's power of eminent domain is the exclusive province of the legislative branch of the government. Since the Legislature cannot in all instances directly supervise the taking of property through condemnation, it has delegated the exercise of that right to numerous State agencies and political subdivisions. N.J.S.A. 20:3-1 to -50; State v. Lanza, 27 N.J. 516, 530, 143 A.2d 571 (1958) appeal dismissed, 358 U.S. 333, 79 S.Ct. 351, 3 L.Ed.2d 350 (1959); New Jersey Housing & Mortgage Finance Agency v. Moses, 215 N.J. Super. 318, 326, 521 A.2d 1307 (App.Div. 1987) (citing Wes Outdoor Advertising Co. v. Goldberg, 55 N.J. 347, 351, 262 A.2d 199 (1970)).
*337 Great discretion is usually granted to condemning authorities in determining what property may be taken for public purposes. Burnett v. Abbott, 14 N.J. 291, 294, 102 A.2d 16 (1954); Texas East. Trans. Corp. v. Wildlife Preserves, 48 N.J. 261, 269, 225 A.2d 130 (1966). This is because our courts recognize that it is for the Legislature to determine what constitutes a "public use." Lanza, supra, 27 N.J. at 530, 143 A.2d 571.
Ordinarily, when a municipality adopts an ordinance in the exercise of its power of eminent domain, that determination is presumed valid and entitled to great deference. Taxpayers Assn. of Weymouth Tp. v. Weymouth Tp., 71 N.J. 249, 264 (1976). City of Trenton v. Lenzner, 16 N.J. 465, 475, 109 A.2d 409 (1954). Courts will generally not inquire into a public body's motive concerning the necessity of the taking or the amount of property to be appropriated for public use. Riggs v. Long Beach Tp., 109 N.J. 601, 613, 538 A.2d 808 (1988); Alsip Park Dist. v. D & M Partnership, 252 Ill. App.3d 277, 192 Ill.Dec. 80, 85, 625 N.E.2d 40, 45 (1993). However, the decision to condemn shall not be enforced where there has been a showing of "improper motives, bad faith, or some other consideration amounting to a manifest abuse of the power of eminent domain." Tennessee Gas Transmission Co. v. Hirschfield, 39 N.J. Super. 286, 288, 120 A.2d 886 (App.Div. 1956) (citation omitted); In re East Windsor Mun. Util. Auth v. Shapiro, 57 N.J. 168, 169, 270 A.2d 410 (1970), cert. denied, 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971); Wes Outdoor Advertising Co. v. Goldberg, 55 N.J. 347, 353, 262 A.2d 199 (1970); City of Trenton v. Lenzner, 16 N.J. 465, 473, 109 A.2d 409 (1954); N.J. Highway Authority v. Currie, 35 N.J. Super. 525, 532, 114 A.2d 587 (App.Div. 1955); State, by State H. Com. v. Totowa Lum. & Sup. Co., 96 N.J. Super. 115, 124, 232 A.2d 655 (App.Div. 1967); Barnegat Light v. Ocean County Freeholder Board, 44 N.J. Super. 332, 352, 130 A.2d 409 (Law Div. 1957).
Within the context of these well established principles, the issue presented by Kessler's challenge to the borough's taking is whether the borough is acting in bad faith in seeking to *338 appropriate Kessler's land. Bad faith generally implies the doing of an act for a dishonest purpose. The term also "contemplates a state of mind affirmatively operating with a furtive design or some motive of interest or ill will." Lustrelon Inc. v. Prutscher, 178 N.J. Super. 128, 144, 428 A.2d 518 (App.Div. 1981) (citation omitted). Thus, although the public purpose for taking land may be valid, if the true reason is beyond the power conferred by law, the condemnation may be set aside. In other words, public bodies may condemn for an authorized purpose but may not condemn to disguise an ulterior motive.
While my research discloses no reported New Jersey decisions upholding a bad faith challenge to a public body's authority to condemn, other jurisdictions have sustained such challenges. See Earth Management, Inc. v. Heard County, 248 Ga. 442, 283 S.E.2d 455 (1981) (condemnation of land for a public park was subterfuge to veil real purpose of preventing construction of a hazardous waste disposal site); Carroll County v. City of Bremen, 256 Ga. 281, 347 S.E.2d 598 (1986) (condemnation for police and fire training facility voided when real purpose was to prevent construction of sewage treatment plant); Pheasant Ridge Assoc. v. Burlington Town, 399 Mass. 771, 506 N.E.2d 1152 (1987) (land taking for park, recreation and moderate income housing seen as pretext to exclude low or moderate income housing); Redevelopment Auth. v. Owners or Parties in Int., 1 Pa.Cmwlth. 378, 274 A.2d 244, 247 (1971) (real reason for condemning defendants' property was to provide a new home for a new owner and not to remove a substandard building); City of Miami v. Wolfe, 150 So.2d 489 (Fla. 1963) (condemnation suit was not for purpose of extending roadway, but to permit public body to acquire valuable riparian rights.); In Re Real Prop. In Inc. Vil. of Hewlett Bay Park, 48 Misc.2d 833, 265 N.Y.S.2d 1006 (N.Y. Sup. Ct. 1966) (real purpose of condemnation proceeding was not to provide village storage area but to prevent construction of parking facility which village deemed undesirable).
*339 These cases make it clear that where a condemnation is commenced for an apparently valid, stated purpose but the real purpose is to prevent a proposed development which is considered undesirable, the condemnation may be set aside. The extensive record in this case compels the inference that Essex Fells undertook this condemnation action for the sole purpose of preventing Kessler's development of a rehabilitation facility in the community. The credible evidence demonstrates that the public purpose articulated for taking Kessler's property, a public park, was selected not based on a true public need but in response to community opposition to Kessler's proposed use of the property. For the nearly two years the property was listed for sale after the soccer field purchase, no consideration was given at any meeting of the Borough Council to any plan or proposal to purchase or condemn the balance of the property for public use. In fact, borough officials stated that the borough's need for any additional recreational space was fully met by it's acquisition of the soccer field.
A number of statements by borough officials provide some evidence that the borough was more interested in who was purchasing the property than in whether the borough could acquire open space. At the September 21, 1993, public hearing, one council member spoke about the "gentlemen's agreement" borough officials made with the Bible College after the soccer field purchase, whereby the college was to sell the balance of the property "to the right people" or else it would make the property available to the borough for purchase. The council member remarked that the college "reneged" on this agreement by selling the property to Kessler. Later, when asked how he felt about Kessler, the official responded, "I would not prefer to have Kessler in Essex Fells, okay?" Also during this meeting, in response to community insistence that the borough acquire the property to prevent Kessler's use of the property, an official cautioned, "You've got to condemn and you've got to develop a public need ... we've got to come up with a need that the court will allow." And, during the opening segment of the October 5, 1993, public meeting, another official stated that a primary reason *340 the borough purchased the soccer field was so that it could have some control over who purchased the balance of the subject property.
The only valid justification for condemning Kessler's land would be that the borough truly needed additional park land or open space, or needed to protect a critical environmental area. As the borough's Master Plan Reexamination Report of August 1992, noted, "[p]ossible acquisitions of vacant land as it becomes available" should be considered. However, my review of the entire record fails to disclose any public discussion, debate or demand for any additional park land or open space until public opposition to Kessler's development plans intensified. Open space was not the primary use the governing body had in mind for this property. Indeed, at the October 5, 1993, public meeting, a Council member stated that the borough's "[f]irst choice was to have a real estate developer go in and acquire the property and put up single family homes." Moreover, at about the same time that the Bible College property was available, another parcel of undeveloped land adjacent to Kessler's property was offered to the borough for sale, but the borough rejected on offer to sell with no any attempt to negotiate the price.
The borough contends that it had considered the subject property for public use when it was first offered for sale but it perceived that residents would consider the cost of acquiring it too high. This perception apparently changed when the results of the questionnaire were received.
In response to the questionnaire, the majority of borough residences approved the condemnation of Kessler's property and the increased taxes to finance the taking. In my view, the decision to poll homeowners demonstrates that as of October 1993, the public body had not determined that it should proceed to condemn Kessler's land for any authorized public purpose. The decision to condemn was thus left to results of a survey rather than the appropriate exercise of the council's judgment and discretion. As one official pointed out at the October 5, 1993, public *341 meeting, "when we send out the mailer, if it comes back and says we don't want any more park land, its fine for Kessler, to come into town...."
The survey itself was flawed, because in allowing one vote per address, rather than one vote per person, it failed to obtain a true public mandate or sentiment on the condemnation issue. In this respect, the questionnaire bore no resemblance to the statutorily authorized procedure for determining voter sentiment on important municipal issues and policies. See N.J.S.A. 19:37-1 to -5. Moreover, the survey itself was clearly a reaction to the growing anti-Kessler sentiment; it was not a proper basis upon which a public body should exercise the power of eminent domain.
The National Recreation and Park Association (NRPA) suggests in its guidelines that a municipality maintain a minimum of 6.25 to 10.5 acres of park land per 1,000 persons. In deposition testimony the borough planner used a figure of about 10 acres per 1,000 persons. Given these figures, the borough, with a population of about 2,200 persons in 1992, and approximately 140 acres of park land and open space, has about 64 acres per 1,000 persons. Of course, nothing prevents a municipality from exceeding the recommended standards. However, in this case, the borough has failed to present any credible, ascertainable public need or plan for the subject property in terms of population patterns or any anticipated increased demand for public land. See Alsip Park Dist. v. D & M Partnership, supra, 192 Ill.Dec. at 86, 625 N.E.2d at 46. No studies were conducted to determine whether there was a need for additional open space and no evidence of utilization or over utilization of existing park land or recreational facilities was presented. The borough had no plans for the development of the property upon its acquisition and no plans for the use or demolition of the existing buildings on the property. The irresistible inference from the evidence and the circumstances presented is that the Borough of Essex Fells has no reasonable public need for the property which it seeks to condemn.
*342 Also unpersuasive is the borough's second reason for condemning this land, to serve as a water recharge for wells in the area. Kessler has credibly established that all six wells located near the subject property are already being purified by mechanical purification units. This is done because several years ago, the New Jersey Department of Environmental Protection found that the wells had been contaminated by off-site groundwater pollution. Kessler thus argues that its use of the property would not harm the critical environmental area. I agree and conclude that the stated public purpose of taking Kessler's land lacks credibility and has no merit. Moreover, the Borough planner testified that Kessler's proposed use would not adversely impact the critical environmental area and would not adversely affect the water recharge area.
The credible evidence in this case justifies the conclusion that, but for the public opposition to Kessler's development proposal, borough officials would not have sought to prevent Kessler's use of the property. The power of eminent domain cannot be justified when used in response to public opinion against a proposed land use. The precipitous fashion in which the borough moved to condemn this site, with no specific plan for its use or development, together with the size of the tract (12.5 acres) in relation to the borough's existing park land and open space, undermines the sincerity of the Borough's stated public purpose and demonstrates bad faith.
Courts are generally reluctant to find bad faith in determining public purpose and thus overturning a decision to condemn. See Carroll County v. City of Bremen, supra, 347 S.E.2d at 599. The evidence should be strong and convincing. See Klump v. Cybulski, 274 Wis. 604, 81 N.W.2d 42, 47 (1957); Uniform Eminent Domain Code § 507. I am clearly convinced from the extensive record here that the Borough proceeded to condemn this property not to establish a park, or to protect a critical environmental area, but to block Kessler's development of *343 a rehabilitation facility in the borough. The complaint in condemnation was presented in bad faith and is therefore dismissed.