Filed 03/25/25

VERMONT SUPERIOR COURT

Chittenden Unit
175 Main Street
Burlington VT 05401
802-863-3467
www.vermontjudiciary.org



CIVIL DIVISION
Case No. 22-CV-00510

---

Mongeon Bay Properties, LLC v. Town of Colchester

---

## FINDINGS, CONCLUSION, AND ORDER

Plaintiff, Mongeon Bay Properties, LLC ("Mongeon"), brought this action challenging the Town of Colchester's decision to take property "for the purpose of constructing, maintaining, operating, and repairing a stormwater treatment facility to replace an existing 24" stormwater outflow located at 885 East Lakeshore Drive." Trial occurred on two days in October 2024. After trial, the court invited and the parties filed post-trial submissions. Having reviewed those submissions, the court makes the following findings and conclusions, all by a preponderance of the credible evidence, and issues the order that follows from the conclusions.

## FINDINGS

### A. Procedural Background

By memorandum submitted to the Colchester Selectboard on August 19, 2021,[1] the Colchester Town Manager recommended the initiation of condemnation proceedings for the property located at 885 East Lakeshore Drive ("the Property"). On August 24, 2021, the Town of Colchester initiated those proceedings. The Town held its hearing on November 9, 2021, and issued its proposed decision on January 7, 2022. As noted above, Mongeon then filed suit challenging the decision. The Town subsequently filed a Petition for Hearing to Determine Necessity and by agreement, the parties proceeded to trial on that Petition.

### B. Factual Background

The property at issue in this case is a part of a larger, unsubdivided parcel owned by Mongeon on the north side of East Lakeshore Drive in the Town of Colchester, Vermont. The Property sits roughly in the middle of the larger parcel. It is improved with a residential camp structure identified as 885 East Lakeshore Drive; that is one of several residential camp structures on the larger parcel.

---

[1] The memorandum, on its face, is dated August 19, 2020. This is clearly a typographical error; the plans attached to the memorandum are dated July 19, 2021, and Attachment D to the memorandum refers to the memorandum as "an August 19, 2021 Memo from Town Manager Aaron Frank to the Selectboard."

Mongeon owns the Property; it currently uses it as a rental. The Property is burdened by an easement in favor of the Town that dates back to 1979. That easement allows the Town to place and maintain a stormwater drainpipe and catch basin on the Property; the Town has done so for an indeterminate period of time, dating back to sometime before 1994, when the Town undertook extensive work at the Property to install a seawall and associated infrastructure in an effort to protect the stormwater outfall pipe. The deed creating the easement also obligates the Town to indemnify Mongeon from any loss, damage, or expense arising out of the exercise of those rights.[2]

On October 31, 2019, a rainstorm caused the stormwater drainpipe at the Property to rupture, resulting in significant washout at the Property and undermining the camp structure. Subsequent investigation revealed that the Town's outflow pipe had failed due to corrosion and deterioration, in turn a result of lack of maintenance. The Town refused to accept responsibility for this event and its consequences, causing Mongeon to retain counsel to assert its rights. Ultimately, the Town's intransigence necessitated Mongeon's filing suit in federal court, eventually securing what the Town's Director of Public Works characterized as a "substantial sum of money" in settlement.

Coincidentally, Mongeon's filing of the federal lawsuit was followed closely by the Town's initiation of condemnation proceedings. Or perhaps there was no coincidence. Prior to the 2019 drainpipe rupture at the Property, in November 2017 the Town had undertaken the Malletts Bay Stormwater Management System & Transportation Scoping Study, a comprehensive review of stormwater treatment options around Malletts Bay. The study identified 49 sites at which the Town could install stormwater treatment. Conspicuously absent from this list was the Property. Then, in 2020, the Town prepared (and later submitted to the State) its Phosphorus Control Plan. That plan lists the 34 most promising phosphorus removal projects known to the Town as of the date of the plan (December 9, 2020), based on the size of those possible projects and their estimated cost effectiveness. Again, conspicuously absent from the plan is any mention of the Property. Notably, however, the plan proposes phosphorus treatment in the MB-09 watershed—which the Town now proposes to treat by

---

[2] As part of its rationale for the proposed taking, the Town points out that the parties who gave the easement did not own a fee interest in the Property; thus the easement may not be a valid conveyance. This is a red herring. It is undisputed that the stormwater outflow at the Property has existed for over 30 years. Moreover, the site visit undertaken at the outset of the trial in this case makes clear that the outflow pipe and associated infrastructure are obvious to the most casual observer. The conclusion is inescapable that the Town's use there has been open, notorious, and hostile, under color of title, and continuous since at least that time. The Town's purported concern about the validity of its easement thus rings hollow.

Moreover, the Town's own conduct in and leading up to this litigation undercuts its present expression of concern for the provenance of the easement. First, in correspondence following the October 2019 failure of the Town's stormwater outflow at the Property, the Town insisted on Mongeon's compliance with the requirements of the easement. See Ex. 11, Attachment B. Later, in in its proposed condemnation decision, the Town made no mention of concerns as to the validity of the easement. See Ex. 2, passim. Finally, in its Answer to the Complaint in this case, the Town admitted without qualification that it "holds a perpetual easement across the Property pursuant to a Quitclaim Deed from Eugene and Margaret Provost dated August 25, 1979." See Answer, ¶ 2.

means of the project for which this taking is intended—using infiltrative treatment methods with 90% phosphorus removal efficiency. (Further along, the reader will learn that the Town now eschews infiltrative treatment methods for this watershed, based on no analysis, and using a technology that promises at best 70-75% phosphorus removal efficiency.)

What happened between the Town's March 2021 submission of the 2020 Phosphorus Control Plan to the State and the Selectboard's August 2021 vote to initiate condemnation proceedings? During this timeframe, the Town did not undertake any additional studies or engage any experts to determine whether the Property was a suitable location for stormwater treatment. It received no recommendation from any outside source. Indeed, while its Director of Public Works testified that his decision to recommend condemnation to the Selectboard was based on analysis by his professional staff, his inability to articulate the particulars of that analysis, coupled with the Town's failure to introduce any other evidence of such analysis, make his testimony in this regard difficult to credit. Rather, the credible evidence establishes that the Town undertook no careful analysis of either the costs or anticipated benefits of stormwater treatment at the Property—much less a comparison of those costs and benefits with those associated with other treatment options. Indeed, the Town's January 7, 2022 Proposed Decision and Order on Necessity and Damages, which is the foundation on which this case rests (Exhibit 2 to the Complaint), includes not a single word reflecting consideration of alternatives or the relative costs and benefits of stormwater treatment at the Property.

What appears to have happened is that after the October 2019 failure of the stormwater outflow, attorneys got involved. In August 2020, counsel for Mongeon reached out to counsel for the Town to discuss solutions. During subsequent conversations, counsel for the Town conveyed that the Town was not happy with Mongeon because of a recent case resulting in eviction of a number of lessees along East Lakeshore Drive, including one of counsel's friends. In a later conversation, counsel for the Town threatened that Mongeon could either sell the Property to the Town, or the Town would take it. Notably, these communications occurred after the Town's Director of Public Works now claims to have become interested in taking the Property. Yet in none of these communications did anyone on behalf of the Town make any mention of a concern for treatment of stormwater or suggest any reason for taking the Property other than to limit liability under the easement. Rather, it was clear from these communications that the only reason the Town wanted to acquire the Property was to resolve Mongeon's claims for property damage arising out of the prior year's outflow pipe failure.

Back and forth between the parties continued through the end of 2020, and while the Town undertook repairs to the stormwater outflow pipe and filled in eroded soils, that did not fully address

Mongeon's claims. Mongeon therefore threatened suit. At a meeting at which at least counsel for the Town, the Town's Director of Public Works, and Mongeon's principal were present, counsel for the Town stated, "if you sue the Town we will take your house by eminent domain."[3] Subsequently, Mongeon filed suit in federal court. Within a couple of weeks, the Town initiated the condemnation process.

### C. __The Project__

The Project for which the Town seeks condemnation is the demolition of the camp structure at the Property and construction of a treatment facility, to remove solids, grit, and contaminants—principally phosphorus—from stormwater before its discharge into the lake. The selection of neither site nor treatment methodology was the result of a careful consideration of alternatives. Rather, the Town's Director of Public Works asked an engineer who was familiar with the Property, "we're interested in doing stormwater treatment at [the Property], can you give me a plan?" The choice of treatment technology then followed not the Town's own phosphorus control plan or best engineering design practices, both of which called for infiltrative rather than end-of-pipeline treatment; instead, it was driven by the choice of site. Not until much later—in fact, after the Town had made its condemnation decision—did the Town ask the engineer to evaluate any other sites for phosphorus treatment in the MB-09 watershed—and even then, the request was only to do a comparative analysis of the costs and benefits of installing the same, end-of-pipe solution at a different location along East Lakeshore Drive.

The Town presented no credible evidence as to the benefits of the Project as compared with its costs. It offered a rough estimate of costs, including land acquisition, totaling $1.603 million. Notably, that estimate was not developed until after the Town had voted to take the Property. The Town presented no competent evidence, however, as to the benefit—the amount of phosphorus removed. Its now-former Director of Public Works testified that it was his projection that the Project would remove 9.7 pounds of phosphorus per year. This witness, however, plainly lacked qualifications to offer any opinion in this regard. The estimate was also based on an outdated methodology for estimating phosphorus base loads in watersheds and an inflated, back-of-the envelope estimate of the amount of stormwater runoff in the MB-09 watershed that would flow through the Project. Finally, in projecting the percentage of the total phosphorus load that the Project would remove from the stormwater that

---

[3] The court notes that the findings in this and the foregoing paragraph are all amply supported by the testimony of Mongeon's principal and its counsel. Notably, the Town offered no rebuttal to this testimony, even though its counsel plainly could have been available to do so; it was her partner who represented the Town at the trial. The strong inference is that the Town conceded the veracity of this testimony. *See Choiniere v. Sulikoski*, 126 Vt. 274, 279 (1967) ("An inference may be drawn against a party who fails to produce available evidence by way of a witness who would apparently be useful to support his case.").

flowed through the Project (70-75%, as contrasted with the 90% that would be removed by the infiltrative technology the Town's prior studies had recommended), the witness relied not on an engineering analysis, but the prediction of the manufacturer of some of the components of the Project. Applying the correct methodology to determine the total phosphorus load of the stormwater that would flow through the project, substituting engineering analysis of the watershed to determine the volume of stormwater that would actually flow through the Project, and using the same (questionable) percentage of phosphorus removed, the projection shrinks by over two-thirds, to 3.29 pounds of phosphorus removed per year. With the Town's estimated project cost of $1,603,000, this means the Project would cost $485,757.58 per pound of phosphorus removed per year.

As noted above, before deciding to condemn the Property, the Town did not consider any other treatment locations; instead, it focused exclusively on the Property. That focus, in turn, precluded the Town's consideration of any other treatment methodologies. It is clear, however, that there are better locations, and treatment methodologies that not only better conform to best engineering practices but yield demonstrably better results at far lower cost. By way of example only, Mongeon's expert witness presented a detailed plan for a subsurface infiltration treatment system at another property owned by Mongeon. That system would treat not only more of the MB-09 watershed than the Project but all of the MB-08 watershed, completely neglected by the Project. The system would remove 9.6 pounds of phosphorus per year—more than 7 pounds per year from the MB-09 watershed served by the Project, plus more than 2.5 pounds from the MB-08 watershed. And the construction costs of this system would be less than half those of the Project. Assuming similar land acquisition costs, the system would cost $50,655.30 per pound of phosphorus removed per year.

Moreover, the location identified by Mongeon's expert for her alternative system design is preferable to the Property for a variety of reasons. The location would have no new impact to the lakefront, does not impact steep slopes, is not located directly between existing buildings, provides easy access for maintenance, eliminates the need for filter media disposal and replacement, provides peak flow reduction of the 1, 10, and 100-year 24-hour rain events, and avoids the cost associated with the purchase and demolition of an existing house. And the infiltrative treatment system would require lower ongoing maintenance expenses than the Project. In short, the alternative design provides far greater benefit to the taxpayer than the Project, by any measure. It does

so at a fraction of the Project's cost. And evidently, based on Mongeon's embrace of this design, it does so at lesser inconvenience and expense to Mongeon.[4]

The only concern that this or any other alternative stormwater treatment solution does not address, vis-à-vis the Project, is the Town's potential liability attached to operation and maintenance of the existing stormwater outflow at the Property. The Town offered no evidence, however, from which the court could do more than speculate as to the likelihood of any such liability coming home to roost, or if it does, the amount of exposure. Rather, the evidence makes clear that there has been one claim against the Town since the easement was granted in 1979. Moreover, there is strong evidence that that claim arose out of the Town's failure properly to inspect and maintain the outflow pipe at the Property. Since the Town undertook to repair the pipe with a cured-in-place liner, which its now-former Director of Public Works testified has a service life of thirty to fifty years, there has been no further damage at the Property—even during the major storm/flooding events of the last two summers. Thus, any exposure going forward is a matter of speculation.

## CONCLUSIONS

The parties agree that the applicable standard here is found in 24 V.S.A. Chapter 101. By further agreement, the vehicle for the court's scrutiny is the petition filed by the Town in response to Mongeon's filing of the Complaint in this case. *See* 24 V.S.A. § 3606. The statute calls for a *de novo* hearing, with the burden on the Town to prove the necessity of the taking. 24 V.S.A. § 3609(b). "Necessity" has a defined meaning: " 'Necessity' means a reasonable need that considers the greatest public good and the least inconvenience and expense to the condemning party and to the property owner." 24 V.S.A. § 3601(4). By its express terms, the statue requires the condemning authority— here, the Town—to make a comparative showing:

> Necessity shall not be measured merely by expense or convenience to the condemning party. Due consideration shall be given to the adequacy of other property and locations; to the quantity, kind, and extent of property that may be taken or rendered unfit for use by the proposed taking; to the probable term of unfitness for use of the property; to the effect of construction upon scenic and recreational values, upon home and homestead rights and the convenience of the owner of the land; to the effect upon town grand list and revenues.

---

[4] The court notes that it found the analytical approach undertaken by Mongeon's expert to be comprehensive and compelling, informed by consistency with the Town's own stormwater management plans, the State of Vermont Stormwater Program's 2017 Vermont Stormwater Management Manual and best current practices for calculating phosphorus loads—all in sharp contrast to the cursory efforts undertaken by the Town. Thus, the court fully credits the expert's testimony and her report (Exhibit 6), and incorporates the latter, to the extent not specifically addressed in the narrative above, as part of its findings.

*Id.* There are two elements to this comparison. Not only must the court consider the "greatest public good"; it must also consider "the least inconvenience and expense to the condemning party and the property owner." *Id.* As a matter of plain meaning, the use of the superlatives, "greatest" and "least," connotes not only a qualitative but a comparative evaluation.

In this case, the Town has failed to make the required showing, on virtually all fronts. Assuming without deciding that the Town's decision to eschew the analysis and recommendations from the 2017 and 2020 studies and focus on the MB-09 watershed to the apparent exclusion of all others for the investment of over $1.5 million was appropriate—and this is far from a given, as the Town presented no persuasive evidence of any comparative analysis that supports the decision[5]—it failed to demonstrate that its choice of either site or technology sufficiently considered alternatives in either regard. Instead, as noted above, the Town focused exclusively on the Property, and that focus, in turn, led to the choice of treatment system design. The only alternative the Town even cursorily considered was another location for the same design—and of course that location was going to lose the comparison, as the system was designed specifically to fit the Property and nowhere else. And as noted above, even that comparison was not undertaken until after the Town had determined to take the Property. Bluntly, this is the antithesis of the careful, comprehensive analysis of the relative costs and benefits of alternatives to the proposed taking that the statute clearly requires.

The court notes that Mongeon moved for judgment at the close of the Town's evidence. It is now clear that the court should have granted that motion, as the findings above make clear that the Town had failed to carry its burden. At best, the Town's evidence suggested that the Project would be a convenient solution to the problem of maintaining an outflow pipe that runs under a property the Town does not own. But the statute makes clear that convenience to the condemning party is not the measure of necessity. And even if it were, the Town's evidence concerning the risks associated with the pipe does not allow the kind of cost-benefit analysis that the statute clearly requires.

---

[5] In what might most charitably be termed a flight of overzealous rhetorical fancy, the Town boldly asserts,

> Long before initiating this proceeding, the Town had considered 49 separate properties as places where the Town could install possible phosphorous reduction projects. It is difficult to conceive of another taking proceeding anywhere in the Vermont jurisprudence where the taking authority gave due consideration to 49 other possible properties for possible selection. The Town clearly met the "due consideration" prong of § 3601.

Town's Post-Trial Mem. at 30. In fact, nothing could be further from the truth. After having carefully considered 49 separate projects and included them in its 2017 plan, the Town then shortened the list to 34 projects that were included in its 2020 plan. It then undertook no disciplined analysis before completely eschewing the analysis that underlay those plans and the recommendations that flowed therefrom. A less fanciful statement would have been, "it is difficult to conceive of another taking proceeding anywhere in Vermont jurisprudence where the taking authority gave due consideration to 49 other possible properties for possible selection and then completely disregarded that analysis in favor of what was, at best, a seat-of-the-pants ad hoc determination." The findings above should make clear that this was decidedly not "due consideration."

Instead, the evidence compels the conclusion that this is a bad faith, pretextual taking, driven not by the careful analysis of costs and benefits and consideration of alternatives that the statute compels, but by the desire to remove what at least the then-Director of Public Works and the Town's counsel felt was a thorn in the Town's side. This, of course, is impermissible. While the Vermont Supreme Court has yet to wade into the waters of bad faith takings, there is a well-developed body of caselaw from other jurisdictions that uniformly condemns bad faith takings as violations of due process. *See, e.g., New England Estates, LLC v. Town of Branford*, 294 Conn. 817, 854 (2010) ("It is well established, however, that a government actor's bad faith exercise of the power of eminent domain is a violation of the takings clause."); *Middletown Township v. Lands of Stone*, 595 Pa. 607, 617 (2007) ("the government is not free to give mere lip service to its authorized purpose or to act precipitously and offer retroactive justification"); *Pheasant Ridge Associates Ltd. Partnership v. Burlington*, 399 Mass. 771, 775 (1987) ("a municipal land taking, proper on its face, may be invalid because it was undertaken in bad faith"); *Earth Management, Inc. v. Heard County*, 248 Ga. 442, 446 (1981) ("We have repeatedly held . . . that a condemning authority may not act in bad faith in the exercise of the right of eminent domain."). The principle underlying these cases was well articulated by a New Jersey trial court: "public bodies may condemn for an authorized purpose but may not condemn to disguise an ulterior motive." *Borough of Essex Fells v. Kessler Inst. for Rehab.*, 289 N.J. Super. 329, 338 (N.J. Super. Ct. 1995). This principle should not be controversial; it is easy to predict that our Court would agree wholeheartedly. In short, the conclusion that the proposed taking here was initiated in bad faith is a separate, independent basis for rejecting the taking.

These conclusions are buttressed by consideration of Mongeon's unrebutted evidence. Essentially, Mongeon did the Town's homework for it—or at least made a start of it. While Mongeon's expert undertook a detailed analysis of only one alternative to the Town's proposed treatment plan, that alternative is so clearly superior to the Town's, by any conceivable measure, that it brings into sharp focus the abject failure of the Town's process to "consider[] the greatest public good and the least inconvenience and expense to the [Town] and to [Mongeon]." Thus, the court adopts Mongeon's expert's conclusion:

> the Town's proposed sketch for stormwater treatment at 885 E.
> Lakeshore Drive would [not] be even the 2nd, 3rd, or 4th preferred stormwater
> treatment location in this watershed as alternative locations exist where Tier I
> treatment practices could be provided for greater phosphorus removal. Alternative
> locations would also be more cost effective, more accessible for maintenance and
> construction, and present a lower risk of failure.

Ex. 6, p. 8.[6]

This conclusion compels rejection of the Town's petition. Not only has the Town failed to demonstrate that its proposed taking "considers the greatest public good and the least inconvenience and expense to the condemning party and to the property owner," Mongeon has demonstrated that it absolutely does not. Instead, the proposal appears tailored to scratch a particular itch, completely unrelated to the stated purpose. And even if scratching that itch could be considered a proper public purpose, the Town has made no showing that amputating the limb on which the itch is found and replacing it with a very expensive prosthetic is the best and most cost-effective solution.

## ORDER

The court denies the Town's Petition. The separate judgment order required by V.R.C.P. 58 will await the taxation of costs. Plaintiff shall submit its verified bill of costs within 14 days of the entry of this Order.

Electronically signed pursuant to V.R.E.F. 9(d): 3/25/2025 9:30 AM

_____
Samuel Hoar, Jr.
Superior Court Judge

---

[6] The court categorically rejects the Town's assertion that "the statute does not vest the landowner with the power to suggest what it believes would be a better property for the condemning authority to take." Town of Colchester's Bench Memorandum, p. 7. The court notes that the authority on which the Town relies to support this assertion does not remotely support it. While it may be true, as the Town notes, that "the determination of scope, design, and necessity lie with the State doing the condemning," *id.* (quoting *Noble Enterprises,Inc. v. State of Vermont Agency of Transportation*, 2023 WL 2456253, *2 (Vt. Super. Ct., Orleans Unit, February 24, 2023), this does not preclude the landowner from contesting that determination. Where, as here, the Town has so completely failed to undertake the kind of careful comparative analysis that the statute so clearly requires, it is certainly open to the landowner to demonstrate that failure. And what better way to do that than by pointing to one or more alternatives that are clearly superior to the Town's, by any reasonable measure? Moreover, the quote on which the Town relies comes from a case decided under a different statutory scheme, under which the condemning agency's determination of necessity and public purpose is entitled to deference. *See* 19 V.S.A. § 505(a)(3)(A). Not so here; the court's review of every aspect of the proposed taking is non-deferential. *See* 24 V.S.A. § 3609 (burden of proof lies with board; determination of necessity lies with court).