THE DEPARTMENT OF TRANSPORTATION *ex rel.* THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. 151 INTERSTATE ROAD CORPORATION *et al.*, Defendants-Appellants.

Second District   No. 2—01—0870

Opinion filed May 30, 2002.—Supplemental opinion filed on denial of rehearing September 20, 2002.

822

Robert J. Pugliese, Hugh C. Griffin, Hugh S. Balsam, and Sarah H. Dearing, all of Lord, Bissell & Brook, of Chicago, for appellants.

Anthony J. Casale, of Civinelli & Casale, of Bloomingdale, and Richard A. Redmond, of McBride, Baker & Coles, of Chicago, for appellee.

Scott M. Day and Rachel K. Robert, both of Day & Robert, P.C., of Naperville, for *amicus curiae* Forest Preserve District of Du Page County.

JUSTICE GROMETER delivered the opinion of the court:

Plaintiff, the Illinois Department of Transportation (IDOT), brought an action seeking to condemn portions of certain properties held by defendants, 151 Interstate Road Corporation and Jane A. Green as trustee and Edward H. Green, Jr., as successor trustee of two revocable trusts. Defendants responded by filing a traverse and motion to dismiss the condemnation complaint. Late in July 2001, following an evidentiary hearing, the circuit court of Du Page County denied defendants' motion. On August 3, 2001, the trial court entered an order vesting title with IDOT. The order was made conditional upon IDOT's deposit with the county treasurer of what the trial court deemed to be preliminary just compensation. Defendants now appeal. For the reasons that follow, we reverse and remand.

■ Before turning to the merits of this appeal, we must address a potential jurisdictional problem. This issue was called to our attention by defendants, and we commend them for their candor and compliance with relevant ethical standards (see 134 Ill. 2d R. 3.3(a)(3)). The instant appeal is interlocutory in nature. Defendants assert that this court has jurisdiction by virtue of Supreme Court Rule 307(a)(7) (188 Ill. 2d R. 307(a)(7)) and section 7—104(b) of the Eminent Domain Act (Act) (735 ILCS 5/7—104(b) (West 2000)). Section 7—104(b) specifies that the following three issues may be raised during an interlocutory appeal: (1) whether the plaintiff has the authority to exercise the right of eminent domain, (2) whether the property that is the object of the action is subject to the exercise of this right, and (3) whether the right is being properly exercised. 735 ILCS 5/7—104(b) (West 2000). Defendants note that in *Southwestern Illinois Development Authority v. National City Environmental, L.L.C.*, 304 Ill. App. 3d 542, 543-44 (1999), the Appellate Court, Fifth District, held that it lacked jurisdiction to consider whether a condemnor negotiated in good faith during such an interlocutory appeal. Defendants seek to raise that issue in this appeal.

We disagree with the Fifth District's holding. The statute authorizing the current appeal states that one of the issues that may be addressed is whether "such right is not being improperly exercised." 735 ILCS 5/7—104(b) (West 2000). The language of a statute must be given its plain and ordinary meaning; where the language is clear and unambiguous, we must apply the statute without resort to further aids of construction. *Burger v. Lutheran General Hospital*, 198 Ill. 2d 21, 40 (2001). At issue here is the meaning of the phrase "improperly exercised." It is well established that good-faith negotiation by the condemnor is a condition precedent to the exercise of the power of condemnation. See *County Board of School Trustees of Du Page County*

*v. Boram*, 26 Ill. 2d 167, 170 (1962); *Department of Transportation ex rel. People v. Brownfield*, 221 Ill. App. 3d 565, 567 (1991); *Department of Transportation v. Walker*, 80 Ill. App. 3d 1039 (1980). It follows that the power cannot be properly exercised absent compliance with this applicable condition precedent. Hence, we conclude that whether a condemnor negotiated in good faith falls squarely within the plain language of the provision allowing the interlocutory appeal of the propriety of an exercise of the power.

In the instant case, defendants filed a traverse and motion to dismiss. The motion was denied, and the matter proceeded to a "quick-take" hearing. The trial court entered one order denying the motion and a second fixing preliminary just compensation and vesting title in plaintiff. Defendants identified both orders in their notice of appeal. In light of the above discussion, this court has jurisdiction to consider this appeal, including the issue of whether IDOT satisfied the requirement that it engage in good-faith negotiation prior to initiating this proceeding.

We further note the dearth of authority provided by IDOT in support of its position. The section in IDOT's brief titled "Points and Authorities" (see 188 Ill. 2d R. 341(e)(1)) would be more elegantly, and aptly, titled simply "Points," for the section is devoid of any authorities. In fact, outside of an occasional reference to the controlling statute and an attempt to distinguish a case upon which defendants rely, the balance of the brief is similarly barren.

## I. BACKGROUND

IDOT is engaged in a project to widen Lake Street in the town of Addison. In order to accomplish this project, IDOT sought to acquire fee simple interests and temporary construction easements in certain properties adjoining Lake Street. One such parcel was owned by a trust (the trust property), and another was owned by a corporation (the corporation property). Both the trust and the corporation are controlled by the Green family. The trust property and the corporation property are adjacent to each other and together cover an area of approximately three acres. The Greens also own additional property (the additional property) that bounds the two parcels but is otherwise unaffected by the proposed condemnation. The additional property, trust property, and corporation property cover about 6.67 acres. This group of properties is located on the southwest corner of Lake Street and Addison Road. About 35,000 cars pass by daily, making it a commercially viable, busy intersection.

In August 2000, IDOT contacted Mark Armstrong, a real estate appraiser, and requested that he appraise the Greens' property. Arm-

strong sent the Greens a registered letter informing them that he had been hired to perform the appraisal. Armstrong met with one of the Greens on the property later that month. The two again met about two months later. Armstrong completed appraisals of the trust property in October 2000 and the corporation property in December 2000. He later updated the appraisals on June 4, 2001. Armstrong concluded that the property had a value of approximately $10 per square foot.

On December 28, 2000, Mark Mathewson, an IDOT negotiator, tendered the Greens an offer of $8,000, by letter, for the interest IDOT wished to acquire in the trust property. On January 8, 2001, Mathewson sent a letter offering $90,000 compensation for the interests IDOT wanted to obtain in the corporation property. Both letters were followed by final-offer letters, mailed the day after the initial offers were sent. As required by section 7—102.1 of the Act (735 ILCS 5/7—102.1 (West 2000)), the letters informed the Greens of the amount of the proposed compensation, that IDOT was willing to continue to negotiate, and that, in the absence of an agreement, it was IDOT's intention to initiate eminent domain proceedings. The letters also acknowledged that, pursuant to the same statutory provision, IDOT could not initiate litigation for a 60-day period following the final offer being tendered.

On February 13, 2001, the Greens, by their attorney, contacted Mathewson. They informed Mathewson that they were getting an appraisal from an independent appraiser and would not be able to respond to IDOT's offer within 60 days of the date of the final-offer letters. The next day, Mathewson recommended that IDOT refer the matter to the Attorney General's office for condemnation.

On March 26, 2001, Mathewson sent the Greens a revised offer regarding the corporation property. This offer reflected a reduction in the area proposed to be taken as well as a $7,000 reduction in the proposed compensation. This letter did not contain any of the statements that section 7—102.1 requires in a final-offer letter. IDOT never sent a final-offer letter following this revision.

In the meantime, the Greens obtained an appraiser, Mary Linberger, and requested that she value the property. Linberger valued the property at $20.68 per square foot. On May 7, 2001, the Greens, by letter, communicated to IDOT the outcome of Linberger's appraisal and offered to settle the matter for $150,800. This amount represented compensation for the per-square-foot value of the property taken. It did not include compensation for the use of the temporary easements or the diminution in value as to the remaining property. The letter was sent to Anthony Casale, who was acting as IDOT's counsel in the

matter. Casale advised the Greens that he had forwarded the offer to IDOT for consideration. IDOT never responded to the offer.

On May 21, 2001, IDOT filed a complaint seeking the condemnation of the Greens' properties. May 21 is 56 days after March 26, which is the date IDOT sent the Greens the revised proposal regarding the corporation property. IDOT sought to acquire immediate vesting of title through the invocation of the "quick-take" procedures outlined in the Act. The Greens responded with a traverse and motion to dismiss. The trial court held a hearing on the motion, commencing on July 26, 2001. We will summarize pertinent portions of the testimony adduced at the hearing.

Mathewson testified regarding his role in the process and also regarding some of IDOT's policies. Mathewson explained that his primary role is to deal with property owners, including explaining the offer and how it was determined. He is also available to answer an owner's questions. He disagreed that it was his job to convince property owners to accept offers, because he felt "convince" implied persuading owners to do something they otherwise would not do. However, Mathewson acknowledged that an IDOT manual stated that a negotiator's role is to "convince the owners of the fairness of the [D]epartment's offer."

Mathewson also described IDOT's "one-offer" method of negotiating. He testified that the policy entailed the State making only one offer. If an owner makes a counteroffer, however, the State will consider it. He stated that he did not have the independent authority to accept a counteroffer for an amount greater than the State's offer. In such circumstances, he explained, he would communicate the counteroffer to IDOT and allow it to evaluate the counteroffer.

Armstrong also testified at the hearing. He stated that he has been a real estate appraiser since 1985 and that he has completed over 200 hours of specialized education in the field. He has also completed approximately two years of college. He is a certified appraiser in Illinois and Michigan. To become certified in Illinois, he had to complete a number of hours of education, perform a number of hours of appraisal work, and pass an examination. Armstrong is an associate member of the Appraisal Institute (the Institute) but has not attained MAI status, which is the Institute's highest designation.

He also testified that he worked for Bulthius Realty Consultants. IDOT has been a Bulthius client since 1990. Bulthius pays Armstrong a commission based on revenues generated from clients. Armstrong has been doing appraisals for IDOT since 1994. Over the past two years, IDOT has paid Bulthius over $161,000 based on Armstrong's work. This accounts for about half of his work. IDOT is Armstrong's

largest account in terms of revenue generated. Armstrong testified that he also works for property owners, lending institutions, and for the Cook County State's Attorney. Armstrong further testified that it was his understanding that IDOT maintains a list of approved appraisers and that to work for IDOT an appraiser must be on that list. He acknowledged that an appraiser could be taken off the list at any time.

Armstrong gave detailed testimony as to the basis of his appraisals, which were updated on June 4, 2001. He testified that the total amount due the Greens for both the trust and corporation properties was $91,000. He determined the property had a value of approximately $10 per square foot. In making his appraisal, Armstrong added the additional properties owned by the Greens to the two parcels that were the subject of the condemnation action. Together, these properties covered an area of 6.67 acres, or about 290,000 square feet. He did so because he believed that the trust property and the corporation property were of insufficient depth to allow for any type of major development. Without aggregating these parcels, he opined, the property could not achieve its highest and best use. Without the additional property, the corporation and trust properties had a depth of 150 feet.

Armstrong used three comparable properties in making his initial valuation. The first was a Walgreens store located across from the Greens' property. This property had been purchased about two years prior to Armstrong's valuation of the Greens' property. It consisted of an area of 58,353 square feet. Armstrong concluded the value of the Walgreens' property was $43.53 per square foot. Armstrong adjusted this value downward 20% because of the relative size of the Walgreens parcel and the size of the aggregated Green parcel, since smaller properties generally bring a higher price per square foot. He reduced the value downward another 20% because he deemed the Walgreens property to have superior access. Finally, he reduced the value downward 40% for "utility." By "utility," Armstrong meant the actual total usable space of the parcel as a percentage of the total size of the parcel. Armstrong conceded that he had not calculated exactly how much more of the land was usable, comparing the two properties. He also conceded that the adjustment was "larger than [he] like[d] to see" and that he preferred to use "more comparable" sales. After making the 80% reduction, this comparable indicated that the aggregated parcel had a value of $8.71 per square foot.

Armstrong also used a site at 225 East Roosevelt Road in Lombard as a comparable, which was also a Walgreens. This property sold in July 1997. Armstrong identified $15.96 per square foot as the price

of the sale. He adjusted this value downward 20% for stock and 20% for access. Thus, this comparable indicated a value of $9.58 for the aggregated parcel. Armstrong acknowledged that this comparable had a depth similar to the corporation and trust properties.

The third comparable Armstrong used is located at 400 West Avenue in Villa Park and is occupied by a Parkway Bank. The area of this property is 87,120 square feet. It sold in March 1997 for $950,000. Armstrong adjusted downward 20% each for size and access and made an upward adjustment of 20% for utility. This yielded a value of $8.72 per square foot for the Green property.

In his updated appraisal, Armstrong included two additional comparables. The first, located at 1400 West Lake Street, occupies an area of 114,693 square feet. It sold two years prior to the appraisal. Armstrong made a downward adjustment because of size. Armstrong conceded that this comparable was approximately the same size as the trust and corporation properties without the additional property added to it. The second is located at 388 West Lake Street in Elmhurst. It sold about three years and three months prior to the appraisal. This property is approximately one-sixth the size of the aggregated parcel.

Armstrong acknowledged that he excluded 33 East Lake Street as a comparable, which is located about a block to the east of the Greens' property. This site sold in December 2000 for $16.88 per square foot and has an area of about a third of an acre. Armstrong agreed that this sale was proximate both in space and time. The site was also inferior to the Greens' property in that it was not located at a signalized intersection. Armstrong explained that he did not use the site as a comparable because of the "principle of substitution." This principle, according to Armstrong, holds that a property should not be used as a comparable where a buyer who wanted to purchase the Greens' property but could not would not be interested in the proposed comparable property. He felt a potential buyer of the Greens' property would not be interested in 33 East Lake Street because it is not of a sufficiently similar size. Nevertheless, Armstrong stated that this principle did not prevent him from using the comparable in Elmhurst, which is one-sixth the size of the aggregated parcel.

Armstrong conceded that there was a general moderate upward trend of prices in the area. He did not make any adjustments to the value of the Greens' property to reflect the fact that some of the sales of parcels he used as comparables occurred over three years prior to his appraisal. He explained that, although there was a general trend in the area, it was necessary to consider individual trends for specific properties and no such adjustment was indicated for the Greens' property. Further, regarding the first three comparables, Armstrong

conceded making a uniform 20% downward adjustment for size despite the fact that these three parcels differed in size. The Walgreens property located across the intersection from the Greens' property has an area of 58,353 square feet while the Parkway Bank location has an area of 87,120 square feet.

Linberger, the appraiser obtained by the Greens, also testified. She stated that she held a master's degree from the University of Chicago and that she was affiliated with the Appraisal Institute. She has been an appraiser for 23 years and has owned her own firm since 1985. She holds the Appraisal Institute's MAI designation, which is the highest designation it offers. She serves on one of the Institute's committees, where she screens applicants for the MAI designation. She acknowledged that she was retained by the Greens to appraise the property from which IDOT proposed to condemn certain interests.

Linberger testified that Armstrong's valuation was "extremely low." She disagreed with his adjustments for the relative sizes of the Greens' property and the comparables he used and characterized them as "fairly dramatic." She noted that "he didn't seem to offer much by virtue of support from the marketplace for making these adjustments." She also disagreed with Armstrong's 80% overall reduction regarding the Walgreens property located across the intersection from the Greens' property, calling it "draconian." She stated that he offered no support from the marketplace for such a downward adjustment.

Linberger also took issue with Armstrong's decision to aggregate the trust and corporation properties with the additional property for the purpose of the appraisal. She first noted that smaller parcels generally bring a higher price per square foot. Regarding the trust and corporation property, she opined that they were very viable for commercial development without the inclusion of the additional property. In support of this opinion, she noted that other parcels of similar dimensions exist in the area. She also stated that adding the additional properties would create excessive depth because commercial users value greater street frontage. Unaggregated, the additional properties would be suitable for residential development.

She further disagreed with Armstrong's decision to exclude the parcel at 33 East Lake Street as a comparable. She rejected Armstrong's reliance on the rule of substitution, noting that it was possible to adjust for size. She relied on this sale as a comparable in her appraisal. Furthermore, she criticized Armstrong's failure to make an upward adjustment to the value of some of the comparables he used to reflect a general upward trend in the value of commercial properties in the Chicago area, as some had been sold over three years prior to his appraisal.

Regarding the parcel at 225 East Roosevelt Road, which Armstrong used as a comparable, Linberger testified that she investigated the sale because she was surprised by the low price Walgreens paid to acquire it. She learned that the buyer paid an additional $700,000 to effectuate a lease buyout, making the effective sale price approximately $26 per square foot. In his appraisal, Armstrong valued this property at $15.96 per square foot.

Linberger fixed the value of the trust and corporation property at $20.68 per square foot. In her appraisal, she relied on four comparables. First, she used the Walgreens site located across from the Greens' property. She chose this site because of its close proximity, the relative recency of its sale, and its similar zoning restrictions. She valued this property at $38.49 per square foot. She also used the property at 33 East Lake Street because of its proximity and the recency of its sale. She noted that, although smaller, it had some inferior attributes. Moreover, although smaller sites tend to bring a higher value per square foot, this site was of a size that limited its commercial viability. She valued it at $16.88 per square foot.

She also relied on two sales that were not proximate to the Greens' property. She stated that she "placed much less reliance on these two sales." They were offered primarily to demonstrate that commercial property can and does bring a price in the area of $20 per square foot in Du Page County. Moreover, she noted that these parcels have a far lower traffic count in front of them than the Greens' property.

During cross-examination, Linberger acknowledged that national drug store companies typically pay a premium in the Chicago area for sites that meet their requirements and stated that she took this factor into account in using Walgreens sites as comparables. She later added that at least the northern portion of the Greens' property would fall within the parameters of what a drug store company would desire. However, she did not value the Greens' property based upon what such a company would pay for it. She further acknowledged that she made a 50% downward adjustment to the Walgreens property located across from the Greens' properties. She also acknowledged that the sale of that Walgreens site involved three different sellers, while the Greens control all of the property at issue in the instant case.

In denying defendants' traverse and motion to dismiss, the trial court first noted that, while Linberger testified that Armstrong's appraisal was "extremely low," she did not state that an appraiser could not arrive at the figure in good faith. Moreover, because the Greens did not make a counteroffer until May 7, the trial court found that IDOT's failure to respond did not constitute a lack of good faith. The trial court also noted that this delay was not indicative of good faith

on the Greens' part in trying to meaningfully negotiate a settlement. The trial court also found that defendants had received the statutorily required 60-day notice by the December and January final-offer letters. The trial court stated that the change in the offer regarding the corporation property was not sufficiently "dramatic" as to require an additional 60-day period, reasoning that the change was merely a *pro rata* reduction in the value and amount of the property. Thus, the trial court found that there was an adequate opportunity to prepare for and respond to the change. While noting that compliance with the 60-day notice provision had not been pleaded, the trial court found that compliance had, in fact, occurred. Defendants now appeal.

## II. ANALYSIS

We will first address defendants' contention that the trial court erred in finding that IDOT engaged in good-faith negotiations prior to instituting the condemnation proceeding. We will next address whether IDOT complied with the 60-day notice provision provided for in the Act. See 735 ILCS 5/102.1(d) (West 2000). Finally, we will determine whether IDOT's failure to plead compliance with this provision required the dismissal of its complaint.

■ The discussion of these issues would benefit from a brief overview of the procedures employed in condemnation actions. When a state agency seeks to obtain a parcel of property, it must, "[a]t the time of first contact with a property owner," provide the owner, in writing, with a description of the property; the name, telephone number, and address of a state official to answer the owner's questions; the identity of the agency; the purpose of the proposed acquisition; and, if applicable, the type of facility to be constructed. 735 ILCS 5/7—102.1(c) (West 2000). At least 60 days prior to filing a petition to initiate a condemnation, the agency must send the owner a letter stating the amount of compensation proposed, the basis for computing the compensation, the agency's willingness to continue to seek a negotiated settlement, and the agency's intention to initiate a condemnation proceeding in the absence of an agreement. 735 ILCS 5/7—102.1(d) (West 2000).

Where no agreement is achieved, the agency may then initiate an action by filing a petition for condemnation. 735 ILCS 5/7—102 (West 2000). The defendant need not answer the petition. *Wehrum v. Village of Lincolnwood*, 91 Ill. App. 2d 418, 421 (1968). The only issue raised by the petition is the amount of compensation due the defendant. *Wehrum*, 91 Ill. App. 2d at 421. If the property owner wishes to challenge the agency's right to condemn the property, the proper vehicle to do so is a traverse and motion to dismiss. *Village of Cary v. Trout Val-*

*ley Ass'n*, 282 Ill. App. 3d 165, 169 (1996). The filing of a traverse and motion to dismiss leads to a hearing on the motion; however, as in the instant case, the hearing resembles a trial more than it does a conventional motion hearing. See H. Sterling, *Pleading and Procedures by Condemnee*, in Illinois Eminent Domain Practice § 3.14 (Ill. Inst. For Cont. Legal Educ. 1995).

The condemnor bears the initial burden of satisfying a *prima facie* case as to any disputed allegations. *Village of Round Lake v. Amann*, 311 Ill. App. 3d 705, 712 (2000). If the plaintiff fails to sustain its burden, the action must be dismissed. *Village of Cary*, 282 Ill. App. 3d at 169. If the plaintiff is successful, the burden shifts to the defendant to prove that the agency lacked the authority to effect the condemnation. *Alsip Park District v. D&M Partnership*, 252 Ill. App. 3d 277, 285 (1993). In the event the action is dismissed, the defendant may seek to recoup attorney fees and costs incurred in defending the action. See *Town of Libertyville v. Bank of Waukegan*, 152 Ill. App. 3d 1066, 1072-73 (1987).

The Act also allows the State and certain other bodies to initiate a "quick-take" proceeding by filing a motion for immediate vesting of title. *Illinois State Toll Highway Authority v. Heritage Standard Bank & Trust Co.*, 250 Ill. App. 3d 665, 669 (1993); 735 ILCS 5/7—103 (West 2000). In a "quick-take" proceeding, the condemnor may acquire title to a parcel prior to the ultimate determination of just compensation. *Board of Junior College District 504 v. Carey*, 43 Ill. 2d 82, 84 (1969). This procedure is designed to avoid needless delay in public-works projects, recognizing that often the sole issue in condemnation cases is the amount of compensation due the condemnee. *Department of Public Works & Buildings v. Vogt*, 51 Ill. App. 3d 770, 776 (1977). IDOT relied on these procedures in the instant case.

As discussed above, certain issues are appealable. In reviewing a trial court's findings on a traverse and motion to dismiss, we apply the manifest-weight standard. *City of Naperville v. Old Second National Bank of Aurora*, 327 Ill. App. 3d 734, 739 (2002); *Village of Round Lake*, 311 Ill. App. 3d at 712. Questions of law, as always, are reviewed *de novo*. *Hidden Grove Condominium Ass'n v. Crooks*, 318 Ill. App. 3d 945, 946 (2001). With these standards in mind, we now turn to the merits of this appeal.

## A. Good-Faith Negotiations

Defendants raise two arguments regarding the trial court's finding that IDOT engaged in good-faith negotiations prior to instituting condemnation proceedings. First, relying on *Walker*, 80 Ill. App. 3d 1039, defendants argue that IDOT's failure to respond to their

counteroffer of May 7 shows a lack of good faith. Second, defendants contend that IDOT failed to act in good faith by relying on an unreasonable appraisal in formulating the only offer that its internal "one-offer" policy allowed it to make.

■ Section 7—102 of the Act allows a body upon which the power of eminent domain is conferred to institute a condemnation proceeding where, *inter alia*, "the compensation to be paid for or in respect of the property sought to be appropriated or damaged *** cannot be agreed upon by the parties interested." 735 ILCS 5/7—102 (West 2000). Thus, the attempt to reach an agreement with a property owner is a condition precedent to the exercise of the power of eminent domain. *City of Oakbrook Terrace v. La Salle National Bank*, 186 Ill. App. 3d 343, 351 (1989). The acquiring authority must make a *bona fide* attempt to reach an agreement with the property owner, and the attempt must be made in good faith. *Brownfield*, 221 Ill. App. 3d at 567. Where no such attempt is made, a condemnation complaint should be dismissed. See *City of Springfield v. West Koke Mill Development Corp.*, 312 Ill. App. 3d 900, 907-08 (2000). Whether IDOT acted in good faith is a finding to which we apply the manifest-weight standard. *Forest Preserve District v. Marquette National Bank*, 208 Ill. App. 3d 823, 827 (1991).

■ We find defendants' first argument, that IDOT's failure to respond to their May 7 counteroffer is sufficient in itself to demonstrate lack of good faith, unpersuasive. We agree with defendants that the facts of *Walker*, 80 Ill. App. 3d 1039, are similar to this case. Further, it is true that *Walker* held that the condemnor's failure "to respond to the owners' counteroffers, despite the assurances of its agents that these counteroffers were being taken under consideration, supports the conclusion of the trial court that there was lack of good faith on the part of the [plaintiff] in these negotiations." *Walker*, 80 Ill. App. 3d at 1043. At its essence, defendants' argument is really a request that we create a *per se* rule that the failure to respond to a counteroffer constitutes a lack of good faith.

This we decline to do. *Walker* itself announced no such *per se* rule; rather, the *Walker* court was merely affirming the decision of a trial court. *Walker*, 80 Ill. App. 3d at 1043-44. In other words, the *Walker* court held that the plaintiff's failure to respond to a counteroffer supported the trial court's decision that the plaintiff had failed to negotiate in good faith. We agree with the *Walker* court that this fact may be indicative of a lack of good faith. However, we cannot conclude that the failure to respond to a counteroffer is always sufficient to demonstrate a lack of good faith. Defendants' reliance on *Walker* is misplaced, and we will not disturb the decision of the trial court on this basis.

Defendants also argue that IDOT's reliance on a suspect appraisal, particularly in light of its "one-offer" method of negotiating, demonstrates that IDOT failed to make a good-faith attempt to reach an agreement with them. We agree. At the hearing on the traverse and motion to dismiss, numerous defects in the bases of Armstrong's opinions were adduced. Most significantly, despite the fact that smaller parcels generally bring a higher value on a per-square-foot basis, Armstrong aggregated the corporation and trust properties with adjacent lands owned by the Greens. After doing so, he adjusted the value of the aggregated parcel downward because of its size. The reason he gave for aggregating these properties was that the trust and corporation property were of an insufficient depth; however, other commercial developments, including one on property he used as a comparable, were of a similar depth.

We also question Armstrong's decision to exclude the property located at 33 East Lake Street as a comparable. This property is located about a block away from the Greens' property and was sold in December 2000. Armstrong referred to the "principle of substitution" to justify his decision to exclude this property. By this statement, he meant that a potential buyer of the Greens' property would not be interested in 33 East Lake Street. According to Armstrong, such a buyer would not be interested because of the property's small size. Nevertheless, Armstrong conceded during cross-examination that he used a parcel one-sixth the size of the aggregated parcel as a comparable.

Despite having reduced the value of the nearby Walgreens comparable 40% to account for "utility," Armstrong acknowledged that he did not have calculations or figures to show how he arrived at that figure or how much more land was actually usable on the Walgreens site. He also applied an across-the-board 20% reduction for the size of various comparables even though some of the comparables varied in size. The nearby Walgreens parcel was about two-thirds the size of the Parkway Bank property. Armstrong was unaware of a $700,000 lease buyout that occurred during the sale of one of the comparables he used and thus could not have accounted for its effect on the actual sale price of that property. Furthermore, the sales of the comparables Armstrong used were temporally remote, some occurring over three years before his appraisal. Armstrong did state that the market did not indicate an adjustment for time was necessary; however, he did make a notation in his appraisal indicating that the general trend of prices in the area was a moderate increase.

Moreover, we note that Armstrong and his firm have a significant and ongoing financial relationship with IDOT. IDOT points out that

Linberger is also a hired expert. However, nothing in the record indicates that the relationship between Linberger and the Greens is anything but a short-term relationship. Conversely, IDOT had accounted for about one-half of Armstrong's work over the two years preceding this case, for which he receives a commission.

In light of the various defects and inconsistencies in Armstrong's appraisal and the potential for bias inherent in the relationship between him and IDOT, we conclude that IDOT's reliance on the report in formulating its offer demonstrated a lack of good faith. We believe that a *bona fide* attempt to negotiate a settlement entails more than procuring a suspect evaluation of a parcel of property and then proceeding solely on the basis of the conclusions reached in that evaluation. We are cognizant of Linberger's testimony characterizing Armstrong's appraisal as "extremely low" rather than as one that had been arrived at in bad faith. However, the question before us is not whether Armstrong acted in bad faith, but whether IDOT failed to act in good faith. That IDOT relied on an "extremely low" offer does little to advance the notion that it acted in good faith.

Going beyond the defects and inconsistencies in Armstrong's appraisal itself, we note the Greens provided IDOT with an independent appraisal that valued the property at approximately double the per-square-foot value that Armstrong assigned it. While, as discussed above, the mere failure of IDOT to respond to the Greens' May 7 counterproposal did not mandate a finding of lack of good faith, the existence of Linberger's appraisal should have caused IDOT to scrutinize its own actions in this matter.

■ Accordingly, we conclude that the trial court's determination that IDOT acted in good faith throughout the negotiations leading up to the filing of this case is contrary to the manifest weight of the evidence. This court recently affirmed a trial court's determination that a condemnor lacked good faith where, after obtaining an appraisal valuing a parcel at $500,000, the condemnor made a series of offers, the highest of which was $425,000. *City of Naperville*, 327 Ill. App. 3d at 739-40. In *City of Naperville*, we found a lack of good faith where the condemnor ignored its own appraisal. *City of Naperville*, 327 Ill. App. 3d at 741. IDOT's reliance on a patently suspect appraisal similarly shows a lack of good faith.

Furthermore, in *West Koke Mill Development Corp.*, 312 Ill. App. 3d at 909-10 (Cook, P.J., dissenting), after the majority found the issue waived, the dissenting justice concluded that an offer to purchase the subject property for $200 was not *bona fide* despite the fact that the offer was based on a figure provided by an appraiser. A second appraiser later employed by the condemnor valued the property at

$31,500. While the differences between the two appraisals in *City of Springfield* are striking, the principle underlying the dissenting justice's conclusion is relevant to the instant case. Quite simply, the condemnor was not entitled to rely on a patently inadequate appraisal. Similarly, in the present case, we conclude that IDOT was not entitled to blindly rely on Armstrong's appraisal.

Having determined that the trial court's decision as to the good faith of IDOT was contrary to the manifest weight of the evidence, we must conclude that the trial court erred in failing to grant defendants' traverse and motion to dismiss. Accordingly, on this basis, we reverse the decision of the trial court.

## B. The 60-day Notice Provision

■ Defendants also argue that IDOT failed to provide them with a 60-day notice prior to instituting the instant proceedings. Section 7—102.1 of the Act, which applies to state agencies, provides that "[a]t least 60 days before filing a petition with any court to initiate a proceeding" under the Act, the agency must send a certified letter to the property owner stating the amount of compensation proposed, that the agency is willing to continue to negotiate, and that the agency intends to initiate condemnation proceedings in the absence of an agreement. 735 ILCS 5/7—102.1(d) (West 2000). Defendants assert that they were deprived of this statutory protection when, on March 26, 2001, IDOT reduced both the amount of compensation and the area of land to be taken and then instituted those proceedings 56 days later. This change affected only the corporation property.

IDOT responds that it was under no obligation to provide the Greens with an additional final-offer letter and 60 days to consider it. IDOT points out that it had already sent final-offer letters in December 2000 and January 2001. IDOT reasons that, since the change resulted in a lesser taking, its initial compliance with the statute was sufficient. Outside of asserting that the statute does not require a second final-offer letter and 60-day period when a condemnor seeks to acquire less property, IDOT provides no authority in support of its position.

IDOT is correct; section 7—102.1 does not explicitly set forth a procedure to govern situations where a condemnor alters an offer after it has been initially communicated to a property owner. See 735 ILCS 5/7—102.1 (West 2000). In fact, this section does not distinguish between initial and subsequent offers at all. See 735 ILCS 5/7—102.1 (West 2000). In construing a statute, its language must be given its plain and ordinary meaning. *Burger*, 198 Ill. 2d at 40. Further, eminent domain statutes must be strictly construed to protect the rights of property owners. *Forest Preserve District v. Estes*, 222 Ill. App. 3d 167,

175 (1991). The plain language of the statute does not draw the distinction IDOT seeks to make. It would be improper for us to read this distinction into the statute. See *T&S Signs, Inc. v. Village of Wadsworth*, 261 Ill. App. 3d 1080, 1091 (1994). Hence, we conclude that the plain language of the statute makes it applicable to initial and revised offers. However, even if we were to find the statute ambiguous, the rule that eminent domain statutes be construed in favor of property owners would compel the conclusion that a material alteration of an offer would mandate that the condemnor provide a new final-offer letter and allow the condemnee 60 days to consider it.

In the present case, IDOT reduced both the proposed area to be acquired and the compensation offered. Had it only reduced the proposed area to be acquired and not modified the compensation offered, we might come to a different result. However, under the present circumstances, we conclude that the Greens were entitled to 60 days to consider the revised offer. See 735 ILCS 5/7—102.1 (West 2000).

Accordingly, we also find reversible error in the trial court's decision on this issue. We limit our reversal on this basis solely to the corporation property. IDOT sent the Greens a final-offer letter regarding the trust property more than 60 days prior to instituting the instant proceedings and did not deviate from that offer.

### C. Failure to Plead Compliance With the 60-day Notice Provision

■ Defendants' final argument is that the trial court should have dismissed IDOT's complaint because it did not plead compliance with the 60-day notice requirement. We first note that section 7—102 of the Act sets forth the necessary contents of a complaint initiating a condemnation proceeding. 735 ILCS 5/7—102 (West 2000). Compliance with the 60-day notice provision contained in section 7—102.1 is not mentioned. See 735 ILCS 5/7—102 (West 2000). In fact, in *Lake County Forest Preserve District v. Reliance Standard Life Insurance Co.*, 29 Ill. App. 3d 145, 148 (1975), this court held that pleading the lapse of 60 days following a final written offer was "neither jurisdictional nor required." See also Illinois Pattern Jury Instructions, Civil, No. 300.00, at 535 (2000).

Furthermore, we are troubled by a more fundamental problem. Generally, when a trial court denies a motion to dismiss a complaint and a defendant files an answer, the defendant waives any objection to defects in the complaint. *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 61 (1994). This rule is intended to encourage parties to challenge complaints at the earliest possible time, so that deficiencies may be cured by amendment. *People v. $1,124,905 U.S. Currency & One 1988 Chevrolet Astro Van*, 177 Ill. 2d 314, 333 (1997). In the present case,

we are beyond the point where the alleged defect could be cured by amendment. Instead, we would have to undo the result of a two-day evidentiary hearing.

The procedure through which eminent domain actions are resolved complicates this issue. As noted above, a defendant need not file an answer and is instead directed to challenge a complaint through a traverse and motion to dismiss. This procedure may, as in the present case, lead to an evidentiary hearing, which, for the most part, resembles a trial. Defendants did file a traverse and motion to dismiss, and an evidentiary hearing was held. The letter of the waiver rule has not been violated; however, its spirit certainly has.

IDOT did not plead compliance with the 60-day notice provision. After reviewing the record, it appears to us that defendants were well aware of IDOT's attempts to comply with the provision and the necessity of compliance with the provision. Defendants were able to fully address this issue, raising it in the hearing on the traverse and motion to dismiss, their interrogatories, and now on appeal. Assuming, *arguendo*, that the failure to plead compliance with the 60-day notice provision was error, we would be reluctant to undo the result of an extensive evidentiary hearing absent some showing of prejudice, particularly where a plaintiff easily could have remedied the purported defect through amendment had the defendant insisted upon it. We see no bar in the procedural rules that apply to condemnation proceedings that would have prevented defendants, if they believed that the pleadings did not provide them with adequate notice, from filing a traverse and motion to dismiss challenging the sufficiency of the pleadings and then a second such motion raising the remainder of the substantive issues they wished to assert after the first motion had been resolved. See *Department of Conservation v. Harold's Farm, Inc.*, 68 Ill. App. 3d 148, 152 (1978) (where the court held a hearing on the defendants' second traverse and motion to dismiss).

Consequently, we reject defendants' final argument. Our review of the applicable case law and section 7—102 of the Act indicates that a condemnor need not plead compliance with the 60-day notice provision. Moreover, in keeping with the spirit of the waiver rule that ordinarily applies to defects in pleadings, we would be loath to disturb the judgment of a lower court to correct a nonprejudicial error following an extensive evidentiary hearing.

## III. CONCLUSION

In light of the foregoing, the order of the circuit court of Du Page County denying defendants' traverse and motion to dismiss is reversed. We remand this cause to allow the trial court to vacate its

subsequent orders fixing preliminary just compensation and vesting title in IDOT and to address the issue of defendants' fees and costs as provided for in the Act.

Reversed and remanded with directions.

HUTCHINSON, P.J., and GEIGER, J., concur.

Supplemental Opinion Upon Denial of Rehearing

JUSTICE GROMETER delivered the opinion of the court:

Defendants, 151 Interstate Road Corporation and Jane A. Green as trustee and Edward H. Green, Jr., as successor trustee of two revocable trusts, previously appealed an order of the circuit court of Du Page County denying their traverse and motion to dismiss, which they filed in response to an eminent domain proceeding initiated by plaintiff, the Illinois Department of Transportation (IDOT). We reversed and remanded with directions. IDOT subsequently filed a petition for rehearing. On our own motion, we requested defendants to respond to the petition. Defendants have done so, and IDOT has filed a reply brief. IDOT takes issue with two portions of our earlier opinion. First, IDOT contests our conclusion that it failed to act in good faith prior to initiating the present litigation. Second, IDOT contends that our construction of section 7—102.1 of the Eminent Domain Act (Act) (735 ILCS 5/7—102.1 (West 2000)) is erroneous. After careful consideration, we deny IDOT's petition for rehearing. Our original opinion issued in this matter contains an extensive discussion of the facts, which we will not repeat here.

■ Before addressing these issues, we acknowledge defendants' understandable and legitimate complaint that they are being forced to relitigate issues on rehearing that should have been addressed in IDOT's initial brief. IDOT's initial brief was nearly devoid of authority. In its petition for rehearing, IDOT acknowledges this omission as well as the prohibition against using a petition for rehearing as a vehicle for rearguing a case (see 155 Ill. 2d R. 367(b)). Generally, points not argued are waived and may not be urged on rehearing. Official Reports Advance Sheet No. 21 (October 17, 2001), R. 341(e)(7), eff. October 1, 2001. This rule is not jurisdictional and may be relaxed as the need for a just result and a uniform body of precedent mandates. *Catalano v. Pechous*, 69 Ill. App. 3d 797, 814 (1978). IDOT urges that this exception applies in the present case. We agree to an extent. In its petition, IDOT raises several important points that warrant this court's attention. However, as the Greens have already been put to the

effort and expense of litigating this matter in the trial court and once on appeal, we will not apply the waiver rule to their prejudice.

In fact, the expense of litigation to which the Greens were thus far exposed brings us to the central issue underlying IDOT's first contention: Who should bear the cost of a deficient appraisal? IDOT argues that, in determining whether it acted in good faith, a condition precedent to filing suit (*Department of Transportation ex rel. People v. Brownfield*, 221 Ill. App. 3d 565, 567 (1991)), it should be judged in light of what information was available to it at each step in the negotiation and condemnation process. While this argument has some appeal, it completely removes from IDOT any responsibility to police its appraisers or verify that an appraisal upon which it is relying is valid. Of course, removing this responsibility from IDOT places it upon the owner of a parcel that IDOT seeks to acquire.

Requiring property owners to bear the burden of identifying defective appraisals places them between the Scylla of accepting an inadequate offer and Charybdis of incurring the expense of contesting the offer. One provision of the Act, however, allows a property owner to escape this dilemma. If a condemnation action is dismissed, a property owner may recoup attorney fees and costs incurred in defending the action. See *Libertyville v. Bank of Waukegan*, 152 Ill. App. 3d 1066, 1072-73 (1987). Because the good faith of the condemnor in seeking an agreement is a condition precedent to the filing of a condemnation action, the lack of good faith on the part of the condemnor requires the dismissal of the action. See *City of Springfield v. West Koke Mill Development Corp.*, 312 Ill. App. 3d 900, 907-08 (2000). This refuge would be illusory in cases involving flawed appraisals if a condemnor were permitted to rely blindly on any appraisal it received. If good faith does not subsume some responsibility to insure that a condemnor is proceeding based upon a reasonable appraisal, a property owner could never secure a dismissal in a case like the present one, and, as a result, the cost of policing the condemnor's appraisers would fall solely on the property owner.

IDOT charges that we have created a netherworld between good faith and bad faith. For IDOT, good faith, in the context of a condemnation, is simply the absence of bad faith. Given this view, IDOT's position that it acted in good faith simply because it was ignorant of certain defects in the appraisal on which it was relying becomes understandable. If good faith is merely the absence of bad faith, IDOT's ignorance would defeat any claim that it was acting with some untoward mental state.

We recognize that the term "good faith" is used in many contexts in the law and that it does not have one universally accepted meaning.

Black's Law Dictionary, for example, provides several not-entirely-overlapping definitions. Black's Law Dictionary 701 (7th ed. 1999) (defining "good faith" as "A state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation, (3) observance of reasonable commercial standards, or (4) absence of intent to defraud or to seek unconscionable advantage"). One widely accepted meaning, which occurs in a variety of contexts, interprets "good faith" to mean something more than the absence of bad faith.

For example, in *Glass v. Peitchel*, 42 Ill. App. 3d 240 (1976), the court considered whether a parent had demonstrated good faith in not seeking employment such that it was appropriate to abate child-support payments. The *Glass* court made the following observation:

> "[I]t appears to us that child support payments may properly be abated or reduced where an inability to pay results from involuntary loss of employment, but we think that such relief should be temporary in nature in the sense that the petitioning party should be required within a reasonable time to establish that continued unemployment was in good faith; *i.e.*, was the result of mental or physical disability or unsuccessful attempts to obtain other employment." *Glass*, 42 Ill. App. 3d at 243.

Thus, the *Glass* court required a parent, in the absence of mental or physical disability, to make actual efforts to obtain employment in order to remain in good-faith compliance with his or her obligations. Sitting by idly, ignorant of potential job opportunities, is insufficient to show good faith. While ignorance of the availability of employment would tend to negate an inference that the parent was deliberately avoiding working, the *Glass* court made clear that such a course of action would be incompatible with good faith.

■ In fact, many courts in many situations have refused to equate "good faith" with the simple lack of bad faith. See *Cayuga Indian Nation v. Pataki*, 165 F. Supp. 2d 266, 299 (N.D.N.Y. 2001) ("In light of the foregoing, in demonstrating its good faith the State must show more than simply the absence of bad faith"); *Garrett v. St. Elizabeth Health Center*, 142 Ohio App. 3d 610, 613, 756 N.E.2d 698, 700 (2001) ("A lack of a good faith effort to settle is not synonymous with bad faith"); *Hoots v. Pennsylvania*, 118 F. Supp. 2d 577, 612 (W.D. Pa. 2000) ("Good faith, though, requires more than simply an absence of bad faith"); *Freeman v. Pitts*, 503 U.S. 467, 499, 118 L. Ed. 2d 108, 139-49, 112 S. Ct. 1430, 1450 (1992) ("With respect to those areas where compliance had not been achieved, the District Court did not find that DCSS had acted in bad faith or engaged in further acts of discrimination since the desegregation plan went into effect. This, though, may not be the equivalent of a finding that the school district

has an affirmative commitment to comply in good faith with the entirety of a desegregation plan, and further proceedings are appropriate for this purpose as well"); *Port Susan Chapel of the Woods v. Port Susan Camping Club*, 50 Wash. App. 176, 185-86, 746 P.2d 816, 821 (1987) ("Counsel must appreciate that good faith in advancing an argument consists of something more substantial than merely an absence of bad faith"); *Penney v. Superior Court*, 28 Cal. App. 3d 941, 953-54, 105 Cal. Rptr. 162, 171 (1972) ("Clearly, a good faith decision not to prosecute on the basis of insufficient evidence should be classified as something more than an absence of bad faith in determining whether a defendant can receive a fair trial"). In short, we have created no netherworld. We have ascribed to "good faith" a meaning that many courts have given it. While "good faith" may mean different things in different contexts, we are convinced that, in the context of a condemnation, it means something more than the lack of bad faith.

█ What that "something more" is may be difficult to define. At the very least, however, it entails that a condemning authority take some responsibility to ensure that property owners are treated fairly. Given the facts of this case, it is clear that IDOT did not live up to this responsibility in its treatment of the Greens. IDOT, by relying on a deficient appraisal, placed them in the position of having to litigate. Their only possible recourse was to demonstrate that IDOT lacked good faith in its treatment of them. We conclude that, by demonstrating that IDOT relied on a completely deficient appraisal, they successfully showed a lack of good faith, which, in turn, mandated the dismissal of the instant action.

Except for two points, we will not revisit our conclusion that the appraisal IDOT relied on was completely deficient. IDOT worries that we have imposed on it a duty to monitor "hundreds and thousands of sales that are recorded in the public records each year to ferret out sales which may have occurred after it received its appraisals and which may be relevant" to an appraisal. We have imposed no such duty. We criticized Armstrong's explanation of why he failed to include a certain sale as a comparable in his appraisals. The sale occurred after Armstrong's initial appraisals but prior to his final one. Armstrong explained that the property was not a valid comparable because of the principle of "substitution," by which he meant that a potential buyer of the Greens' property would not be interested in this parcel due to its small size. Armstrong later admitted that he used a property one-sixth the size of the Greens' as a comparable. We included this criticism not to impose any duty on condemnors to monitor the real estate market in the months following an appraisal; rather, we included it because Armstrong's explanation defied credulity.

IDOT also questions our reliance on the potential for financial bias present in its relationship with Armstrong. Over the two years preceding the trial, IDOT paid Armstrong's employer over $161,000 based on his work. This accounts for about half his work and makes IDOT Armstrong's largest account. Armstrong is paid a commission based on revenue generated from clients. IDOT argues that these facts reflect the fact that it must, of necessity, use a limited number of appraisers familiar with eminent domain appraisal work. IDOT's plight is not unique. All parties who must hire expert witnesses must defend them from similar charges. In *Sears v. Rutishauser*, 102 Ill. 2d 402, 407 (1984), our supreme court observed that "[g]enerally, opposing counsel may probe bias, partisanship or financial interest of an expert witness on cross-examination." Recognizing the importance of potential financial bias, the court went on to hold that counsel may cross-examine an expert witness as to "the number and frequency of referrals from an attorney." *Sears*, 102 Ill. 2d at 411. We see no principled way of distinguishing *Sears* from the situation IDOT faces.

IDOT also complains that it has neither the expertise nor the resources to question appraisals made by outside appraisers. Regarding the resources, we note that IDOT likely has better resources than the average property owner. Further, the claimed lack of expertise does not appear to be an insurmountable problem. For example, a second independent appraisal by an outside appraiser confirming the first would go a long way toward demonstrating good faith. In fact, IDOT argues for the first time before this court in its petition for rehearing that such a second appraisal was performed. Defendants dispute the validity of this appraisal. We will not address this argument. Because IDOT did not raise it until its petition for rehearing, we deem it waived. Official Reports Advance Sheet No. 21 (October 17, 2001), R. 341(e)(7), eff. October 1, 2001; *Catalano v. Pechous*, 69 Ill. App. 3d at 814.

We are cognizant that requiring condemnors to take some responsibility for policing their own appraisers will increase the costs to the condemnor for effectuating a condemnation. However, the alternative, requiring property owners to shoulder this burden, is unacceptable. Both the Illinois and United States Constitutions require just compensation when the government takes private property for a public use. U.S. Const., amend. V; Ill. Const. 1970, art. I, § 15. Forcing property owners to bear the expense of uncovering defective appraisals guarantees that owners, confronted by an inadequate offer based on such an appraisal, will be left in a worse position than they would have been had the state not decided to take their property. Their only two choices would be to accept the low offer or absorb the costs of

litigating the matter. Thus, we conclude that the requirement of good faith requires a condemnor to take some responsibility for the quality of its appraisals. When that good faith is lacking, a property owner may appropriately secure the dismissal of the action and recover the costs of the litigation. See *Bank of Waukegan*, 152 Ill. App. 3d at 1072-73.

IDOT's second main contention is that our interpretation of section 7—102.1 of the Act (735 ILCS 5/7—102.1 (West 2000)) is unworkable. This section requires a condemnor to provide a property owner with 60 days' notice prior to initiating a condemnation action. 735 ILCS 5/7—102.1 (West 2000). Defendants argued that they were deprived of this protection because IDOT filed suit less than 60 days after it revised its offer, reducing both the area to be taken and the compensation to be given. We agreed. In our original opinion, we first noted that eminent domain statutes are to be construed strictly in favor of property owners. 333 Ill. App. 3d at 837. We next observed that the plain language of section 7—102.1 draws no distinction between initial and subsequent offers. 333 Ill. App. 3d at 838. Accordingly, we determined that defendants were entitled to 60 days to consider IDOT's new offer.

IDOT charges that this reading of the statute provides a condemnor with a disincentive to negotiate. IDOT ignores the following language from our original opinion: "In the present case, IDOT reduced both the proposed area to be acquired and the compensation offered. Had it only reduced the proposed area to be acquired and not modified the compensation offered, we might come to a different result." 333 Ill. App. 3d at 838. Decreases in compensation and increases in area to be taken work to the disadvantage of a property owner; the converse is true of a second offer that increases compensation or decreases the area sought. Keeping in mind that eminent domain statutes must be strictly construed in favor of owners (*Forest Preserve District of Kane County v. Estes*, 222 Ill. App. 3d 167, 175 (1991)), it is clear that a second offer that prejudices the owner warrants a new 60-day period. Thus, had compensation remained the same, or increased, a new 60-day period would not have been triggered. Since the logical product of negotiation is an increased offer of compensation, our interpretation of the statute provides no disincentive to negotiate.

IDOT also asserts that this interpretation will discourage it from "correcting unnecessary takings." It contends that, as a result, owners will be required to sell property they do not want to, it will be forced to buy land it does not need, and Illinois taxpayers will be required to pay for additional, unnecessary property. These concerns

are unfounded. The power of eminent domain is limited to takings that are necessary. *City of Waukegan v. Stanczak*, 6 Ill. 2d 594, 599 (1955). Hence, IDOT has no authority to take land it does not need and force the taxpayers of this state to shoulder the bill. At the most, our decision will require IDOT to wait an additional 60 days when it is necessary to make a new offer. We see nothing unreasonable in giving property owners the period set forth in the statute to consider the actual taking proposed by a condemnor. At the least, our decision should encourage condemnors to ascertain what it is that they truly need before beginning the condemnation process, rather than proceeding in a haphazard fashion.

To conclude, we find no reason to depart from the views expressed in our original opinion. We recognize the importance of the mission of IDOT and all condemnors charged with performing works in the public interest. IDOT states in its petition that the project that spawned the present litigation is a $42 million project "fueled by the public's demand for efficient, safe roads that ease the problems of gridlocked suburban intersections." However, similar things can likely be said about virtually every project in which IDOT engages. Allowing such concerns to predominate would effectively place the condemnation process beyond judicial scrutiny. Such a result is something the legislature did not intend, for they provided for court involvement in the Act (see, *e.g.*, 735 ILCS 5/7—102 (West 2000)).

IDOT raises a few additional arguments, which we find either ill-taken or waived. Accordingly, we deny plaintiff's petition for rehearing.

HUTCHINSON, P.J., and GEIGER, J., concur.